The PILLSBURY COMPANY,
Respondent,

v.

Allan ELSTON, Appellant.

No. 49032.

Supreme Court of Minnesota.

July 27, 1979.

Rehearing Denied Aug. 21, 1979.

Grossman, Karlins, Siegel & Brill and Sheldon D. Karlins and Donna Wolfson, Minneapolis, for appellant.

Faegre & Benson and Lawrence Brown, Minneapolis, for respondent.

Heard before PETERSON, KELLY, and YETKA, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

The present case involves an action by plaintiff, The Pillsbury Company, against defendant, Allan Elston, a former vice president of Pillsbury. Pillsbury claims the right to repurchase 1,425 shares of its common stock at the option price paid by Elston, who acquired the shares pursuant to Pillsbury's Qualified Stock Option Plan. Elston appeals from the trial court's judgment holding that Pillsbury has an enforceable option to repurchase the shares and ordering Elston to deliver the shares to Pillsbury upon Pillsbury's payment of the option price previously paid by Elston. We hold that Pillsbury has an enforceable option to repurchase Elston's shares. However, because Elston holds the shares in joint tenancy with his wife and she is not a party to this action, her interest in the shares cannot be affected in this proceeding. We modify the trial court's order.

The following material and undisputed facts were found by the trial court:

1. Elston was employed by Pillsbury commencing October 27, 1969, and continued his employment until he voluntarily terminated effective June 30, 1975.

2. During his employment, Elston and Pillsbury entered into three option agreements dated August 7, 1972; July 11, 1973; and November 7, 1974, respectively. The options were granted to Elston by Pillsbury in accordance with Pillsbury's plan adopted by its Board of Directors on November 9, 1964, and approved by its stockholders at a special meeting on February 1, 1965.

3. By letters dated June 2, 1975, Elston exercised certain options under the option agreements and purchased 1,425 shares of Pillsbury common stock.

4. On June 30, 1975, upon Elston's instruction, Pillsbury delivered 1,425 shares of its common stock, evidenced by Certificate No. MU 3119, to Elston and his wife, as joint tenants.

5. By letter dated July 1, 1975, Pillsbury made demand upon Elston to accept payment of $54,262.50 [1] for the 1,425 shares and to deliver Certificate No. MU 3119 to Pillsbury.

6. Upon Elston's refusal to accept payment and to deliver the certificate to Pillsbury, this action was commenced by Pillsbury to enforce its rights and Elston's obligations under the repurchase provisions of the option agreements, which provide:

"The Company may repurchase within 190 days after the date of any exercise of this Option all shares of stock which have been purchased within six months prior to the employment termination date * * for the total amount paid by the Employee for such shares." Para. 6(a).

The gravamen of this case is whether the above-quoted provision obligates Elston to resell to Pillsbury at option price the shares he received upon exercise of his options.

Elston makes various arguments in support of his contention that the trial court misinterpreted the repurchase provisions of Para. 6(a) of the option agreements. First, he contends the language of the repurchase provisions imposes no obligation upon an unwilling optionee to sell. Elston relies upon the following language of Para. 6(a), "The company *may* repurchase." (Italics supplied.) He further notes that no phrase such as "right to repurchase" is found in Para. 6(a). In effect, Elston claims the language of Para. 6(a) is ambiguous and could easily be interpreted to mean that Pillsbury was merely empowered or authorized to repurchase the stock with Elston's consent.

1. Elston paid Pillsbury $54,262.50 for the 1,425 shares he acquired on June 30, 1975, pursuant to options he exercised by letters dated June 2, 1975.

The word "may," as used in the repurchase provisions, produces no ambiguity in Para. 6(a). "May" is clearly a word of authority. The plain meaning of the sentence is that Pillsbury, if it wanted to, could repurchase the shares of stock. To accept Elston's argument that the sentence could just as well mean Pillsbury could repurchase the shares only with an optionee's approval would require this court to unnecessarily distort the meaning of the word "may."

Second, Elston contends there is sufficient evidence that the parties intended the stock options to be "qualified" stock options under the Internal Revenue Code, § 422, and, therefore, that the option agreements were intended to be interpreted according to Internal Revenue Code terms. He further contends the repurchase provisions as interpreted by the trial court fail to effect a "transfer" as required by § 422, with the result that the options become "unqualified" under § 422, which illustrates the trial court incorrectly interpreted the option agreements.

The facts relied upon by Elston in his argument can be briefly summarized:

(1) Pillsbury's plan states, at Paras. 7 and 12:

"Options granted under the plan may contain such provisions as deemed advisable to permit qualification as 'qualified stock options' within the meaning of Section 422 of the Internal Revenue Code of 1954 as added by the Revenue Act of 1964, as the same may be amended, and options may be amended if necessary, to permit such qualification.

\*    \*    \*    \*    \*    \*

"The Board of Directors may, by resolution, amend, suspend or discontinue the Plan, except that no such action may be taken which would prevent options issued under the Plan from being 'qualified stock options' within the meaning of the Internal Revenue Code  \*   \*   \*."

(2) The option agreements, in their preambles, state:

"WHEREAS The Company desires, in accordance with the Company's Qualified Stock Option Plan adopted by the Board of Directors of the Company November 9, 1964  \*   \*   \*."

(3) The stipulation of facts entered into between the parties states, in part:

"The Plan, and the Options granted pursuant to the Plan, were intended to meet the requirements of I.R.C., Section 422 for 'qualified stock options.' "

The trial court held that the introductory reference in the option agreements to the plan as the source of Pillsbury's power to grant options was not sufficient to indicate that the parties intended to use the Internal Revenue Code to interpret the option agreements, a holding we find not to be clearly erroneous. The option agreements contain no reference to provisions of the Internal Revenue Code. While the parties could have agreed to have the option agreements interpreted by the standards set forth in § 422, there is not sufficient indication of such intention in the words of the option agreements. It is clear Pillsbury intended its plan to be a "qualified" plan for tax status under the Internal Revenue Code, but that is not to say that Pillsbury and Elston intended that the option agreements be "interpreted" by reference to § 422. An intention to use the Internal Revenue Code as the benchmark for interpreting the meaning of the option agreements would have to be more clearly expressed.[2]

---

2. Elston, in part, attacks the trial court's finding by contending that it relied upon an erroneous rule of law. It is his contention that the trial court believed that a specific reference to the Internal Revenue Code in the option agreements was required. Elston argues that the case law does not mandate any such requirement, that only a "specific indication of an intention" to be guided by terms of the Internal Revenue Code is mandated, and that the facts in the present case demonstrate such a "specific indication."

Two relevant cases, *Langer v. Iowa Beef Packers, Inc.*, 420 F.2d 365 (8 Cir. 1970), and *Lucas v. Seagrave Corp.*, 277 F.Supp. 338 (D.Minn.1967), demonstrate that some specific reference to the Internal Revenue Code has to be found in a relevant stock option agreement

█ Third, Elston contends the trial court's interpretation of the repurchase provisions renders the option agreements illusory, because at any time, no matter how long an employee eligible for the options has rendered service to Pillsbury, his right to exercise the options can be negated by Pillsbury's decision to terminate the employee within the 190-day period following the employee's exercise of the options. Essentially, Elston's position is that he fully performed the consideration required under the option agreements when he remained with Pillsbury for the period of time required under the option agreements. He was thereby enabled to exercise the options, and this right was extinguished when Pillsbury exercised its repurchase rights within the 190-day period.

The argument is not persuasive. As evidenced by the relevant documents,[3] the purpose for granting the stock options was to induce a specific employee to remain with Pillsbury. In return for granting the stock options, Pillsbury had to receive consideration from that employee. In the present case, the option agreements required Elston to continue in Pillsbury's employ for a fixed period of time before he was entitled to exercise the options. Pillsbury thereby sought the benefit of Elston's future services as consideration for granting the options. If Elston had terminated his employment with Pillsbury before expiration of the designated time periods, the options granted to him would have failed to mature into exercisable rights. In addition, the option agreements required that Elston remain in Pillsbury's employ for a fixed period of time (6 months) after exercise of the options in order to satisfy Para. 6(a)'s repurchase provisions.[4] Pillsbury thereby sought an additional benefit of Elston's services as consideration for granting the options.

Elston agreed to all of the provisions of the option agreements when he entered into the agreements with Pillsbury. Elston controlled the timing of his voluntary decision to terminate his employment with Pillsbury. The consideration Pillsbury required of Elston was determined by and set forth in the provisions of the option agreements, which apparently were acceptable to Elston when he entered into them in anticipation of the additional benefits the options ultimately would afford. The trial court's interpretation of the repurchase provisions does not render illusory the option agreements.[5]

Finally, Elston argues the option agreements established absolute and indefeasibly vested rights for him, terminable only upon his being discharged without having exercised the options or by a lapse of the time within which the options might have been exercised. Elston relies upon the following language in Para. 1 of the option agreements:

---

3. before a court should decide that the parties intended that their agreement be interpreted by provisions of the Internal Revenue Code. Such a view is buttressed by the following: " * * * [T]he applicable provisions of the Internal Revenue Code are relevant only to the tax status of a stock-option plan and not to the interpretation of a particular stock-option agreement as between the corporation and an officer or employee, *unless the agreement specifically makes reference thereto.*" (Italics supplied.) 5 W. Fletcher, Cyclopedia of the Law of Private Corporations § 2143.1, p. 554 (rev. perm. ed. 1976). Furthermore, even if defendant is correct in his position that only a "specific indication of an intention" to be guided by the provisions of the Internal Revenue Code is required, the facts in the present case do not adequately demonstrate such an intention.

3. For example, the section of Pillsbury's Qualified Stock Option Plan entitled "Purpose of Plan" provides: "The purpose of the Plan is to promote the interests of the Company and its stockholders by providing a means whereby employees who are primarily responsible for the Company's financial success will have an interest in such stock through ownership of stock of the Company or because of an opportunity to acquire such stock, and by providing to officers and other key employees an inducement to remain with the Company."

4. The granting clause in Para. 3 of the option agreements expressly states that it is subject "to the provisions of paragraph 6 * * *."

5. Elston relies on *Langer v. Iowa Beef Packers, Inc., supra.* This reliance is misplaced, because there are many factual differences between *Langer* and the present case.

"The Company hereby irrevocably grants to the Employee, as a matter of separate agreement, and not in lieu of salary or any other compensation for services, the right and option * * * to purchase all or any part of an aggregate of ___ shares of Stock on the terms and conditions herein set forth."

Elston contends that the trial court's interpretation of the repurchase provisions, combined with Pillsbury's right at any time to terminate his employment, would give Pillsbury the power to demand forfeiture of these indefeasibly vested benefits. Elston notes the strong policy against forfeiture of employee benefits and contends that the policy illustrates the error of the trial court's interpretation of the repurchase provisions.

This argument is also not persuasive. As the above-quoted portion of Para. 1 of the option agreements itself demonstrates, the irrevocable grant of options to Elston was expressly made "on the terms and conditions herein set forth." One of the conditions was Pillsbury's right, within 190 days after the date of exercise of the option, to repurchase, for the total amount paid by Elston, all shares purchased pursuant to the option within 6 months prior to the date of Elston's termination.

Moreover, Elston's argument disregards the difference between his option rights under the provisions of the option agreements and his right to stock upon exercise of the option rights. Pillsbury does not dispute that Elston obtained option rights. The present dispute, rather, focuses upon Pillsbury's right and Elston's obligations after Elston exercised his option rights and then voluntarily terminated employment with plaintiff within the 6-month period.

The "rights" obtained by Elston were subject to numerous express conditions. Elston did not have an indefeasibly vested right to the shares, although he did have the right to exercise the options. Elston never obtained any "right" to Pillsbury's stock that can be said to have been forfeited upon his failure to fulfill the express condition of continued employment for 6 months after he exercised his options in June 1975.[6]

We therefore hold that Pillsbury has the right to enforce the repurchase provisions against Elston.

■ A complicating factor in this case is that the certificate evidencing the shares of stock was issued to Elston and his wife, as joint tenants. Elston's wife was never a party to this action. Pillsbury's rights under the repurchase provisions against Elston were properly adjudicated. However, because Elston's wife was not a party, she has not been heard on the issue of Pillsbury's repurchase rights against her interest in the stock. Nothing in this affirmance of the trial court's decision applies to her interest in the stock.[7]

We direct the trial court to modify its original order and thereby require Elston to assign to Pillsbury his undivided one-half interest in the shares evidenced by Certificate No. MU 3119, together with the distributions of stock and cash dividends paid on or with respect thereto after June 30, 1975, and to require Pillsbury to tender to Elston in exchange for his interest in the shares the sum of $27,131.25.[8]

Affirmed, and remanded with directions to modify.

TODD, J., took no part in the consideration or decision of this case.

6. Despite Elston's contrary argument, neither the holding nor the language of this court's decision in *Harris v. Bolin*, 310 Minn. 391, 247 N.W.2d 600 (1976), have application to this appeal. And, despite Elston's argument, nothing in the manner in which Pillsbury issued the shares of stock negates its right to repurchase them.

7. This opinion should not be interpreted to indicate a determination by this court of the ques-

tion whether Pillsbury can enforce the repurchase provisions against Elston's wife.

8. For the first time on appeal, Elston contends he should be entitled to interest on the option price from and after July 1, 1975, the date of Pillsbury's formal demand to repurchase. Elston admits he did not present this issue to the trial court, and we therefore refuse to consider it on appeal.