Keith A. WINGFIELD *v.* CONTECH CONSTRUCTION PRODUCTS, INC.

CA 03-154                                                      115 S.W.3d 336

Court of Appeals of Arkansas
Division II
Opinion delivered August 27, 2003

*Appellant*, pro se.

*Quattlebaum, Grooms, Tull & Burrow, PLLC,* by: *E.B. Chiles, IV,* for appellee.

A NDREE LAYTON ROAF, Judge. Appellant Keith Wingfield appeals pro se from the grant of summary judgment in favor of appellee Contech Construction Products, Inc. ("Contech"), his former employer. After terminating Wingfield's employment and exercising its option to repurchase company stock owned by him, Contech filed suit against Wingfield to recover interest on a promissory note used to purchase the stock. Wingfield defended the suit by alleging that he was wrongfully terminated and that Contech should be estopped from repurchasing the stock and collecting interest on the note. Contech filed a motion for summary judgment, which was granted by the trial court. On appeal, Wingfield argues that the trial court erred: (1) in granting Contech summary judgment without submitting the case to a jury for a determination of whether he was wrongfully terminated as a result of his whistleblowing; (2) in granting summary judgment to Contech because it should be estopped from any action against him based on wrongful termination; (3) by granting Contech summary judgment because questions of fact remain regarding Contech's motive for his termination; (4) in granting summary judgment to Contech without a consideration of the public policy issues of denying an employee-shareholder the gain in value of his investment in Contech. We affirm.

Contech manufactures and sells, among other things, corrugated metal pipe used in drainage culverts for highway construction projects. Wingfield was a shareholder and employee of Caldwell Culvert Company ("Caldwell"), a competitor of Contech. In 1995, Contech bought all of the outstanding shares of Caldwell, and Wingfield became employed by Contech. Pursuant to his employment with Contech, Wingfield purchased 5,000 shares of Contech Holdings Corporation ("CHC") stock at a price of $54.68, and he also received an option to purchase 166 additional shares. On February 19, 1997, Wingfield executed a promissory note with Contech for the purchase of the stock in the amount of $273,400, with an interest rate of 8%. The promissory

note provided that the note would mature if Wingfield's employment with Contech was terminated "for any reason" and CHC exercised its "call option" to purchase the stock pursuant to the Stockholders Agreement, or if Wingfield attempted to sell or transfer the stock. Upon the occurrence of either of these events, the entire amount of the note, along with all accrued and unpaid interest, became due.

The Stockholders Agreement, also signed by Wingfield on February 19, 1997, provided that CHC would have a call option with respect to Wingfield's shares of its stock and his option to purchase additional stock in the event Wingfield's employment with Contech was terminated. The agreement stated that if Wingfield was terminated for cause, CHC would have the right to purchase the stock at the lower of the book value price or the original cost. In other situations, such as when Wingfield's termination was without cause and without the approval of the majority of the board of directors, or when the termination was due to his death or disability, the agreement stated that the stock would be purchased at book value.

In April 1999, Wingfield pled guilty to conspiring to defraud the United States and the State of Louisiana in connection with Caldwell's substitution of non-approved steel pipe for use on state and federally funded highway projects in Louisiana. After learning of these facts in June 1999, Contech placed Wingfield on administrative leave on July 23, 1999. On December 10, 1999, Contech notified Wingfield that his employment was being terminated for two reasons: his plea of guilty to a felony, and his commission of an act of fraud or dishonesty against Contech. Pursuant to the Stockholders Agreement, CHC then notified Wingfield in January 2000 that it was exercising its call option with respect to Wingfield's stock. Wingfield was informed that CHC would pay to Contech on his behalf the aggregate purchase price of $273,400 to satisfy in full the principal amount due under the promissory note. However, CHC also notified Wingfield that $71,005.26 was due and payable to Contech by February 17, 2000, for the interest on the note at the rate of 8%.

When Wingfield refused to pay the interest due under the promissory note, Contech filed suit against him in August 2001. In his Amended Answer, Wingfield alleged that Contech did not terminate his employment for the reasons asserted in its complaint. Instead, Wingfield averred that Contech was aware of the product

substitution by Caldwell before he was hired, and that Contech's true motive for terminating him was retaliation for his conduct as a successful whistle blower in a federal action filed by him against Contech under the Federal False Claims Act for its own acts of fraudulent product substitution. Wingfield further alleged that Contech was thus estopped from relying on its stated reasons as a basis for his termination under the employment agreement and that he owed no debt to Contech. Wingfield admitted, however, that if his stock was repurchased by CHC, Contech would be entitled to interest under the promissory note, but he alleged that he was entitled to the difference between the book value of the stock on the date of purchase and the fair market value of the stock upon such repurchase. Wingfield further stated that the provisions of the Stockholders Agreement relied upon by Contech were unenforceable and void as against public policy. Because he alleged that the call option provisions were unenforceable, Wingfield stated that Contech was not entitled to interest under the terms of the promissory note. Alternatively, he alleged that he was entitled to a setoff against any interest due, based on the book value of the stock at the time of the transfer.

Wingfield also filed a counterclaim, in which he alleged that Contech had breached the Incorporation Agreement between the parties by not providing him with its annual statements and monthly and quarterly reports. Wingfield sought an accounting from Contech, including all of the financial information that he had not been provided. Upon the motion of Contech, the trial court dismissed Wingfield's amended counterclaim without prejudice, based on its failure to state facts upon which relief could be granted.

In August 2002, Contech filed a motion for summary judgment, stating that Wingfield's allegation that he was terminated without just cause could not, as a matter of law, defeat his obligations under the promissory note. Contech alleged that there were no genuine issues as to any material fact as to whether Wingfield owed interest on the note and that it was thus entitled to summary judgment. As support for its motion, Contech attached the promissory note, the Stockholders Agreement, the guilty plea agreement, and Wingfield's responses to Interrogatories and Requests for Production of Documents. In response to Contech's motion, Wingfield reiterated his allegations of wrongful discharge and replied that Contech's intent in terminating him was a question of fact that should defeat the motion for summary

judgment. Wingfield did not attach any documents or other proof to support his response. After a hearing, the trial court found that there was no genuine issue as to any material fact and that Contech was entitled to summary judgment as a matter of law. Wingfield appeals from this decision.

On appeal, this court need only decide if the grant of summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Flentje v. First Nat'l Bank of Wynne*, 340 Ark. 563, 11 S.W.3d 531 (2000). The burden of sustaining a motion for summary judgment is on the movant. *Id.* All proof submitted must be viewed in the light most favorable to the party resisting the motion, and any doubts or inferences are resolved against the moving party. *Id.* Once the moving party has established a prima facie entitlement to summary judgment by affidavits or other supporting documents, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* Summary judgment is appropriate under Ark. R. Civ. P. 56(c) when there is no genuine issue as to a material fact and when the moving party is entitled to summary judgment as a matter of law. *Id.*

In his first three points, Wingfield argues that summary judgment was inappropriate because there remain unresolved questions of fact regarding the reason for his termination by Contech. Wingfield asserts that he was wrongfully terminated in retaliation for his whistle-blowing activities and that Contech is estopped because of this wrongful discharge from exercising its option to repurchase his stock and collecting interest on the promissory note. He further contends that the issue of estoppel should have been presented to the jury.

Wingfield cites *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988), and *Skrable v. St. Vincent Infirmary*, 57 Ark. App. 164, 943 S.W.2d 236 (1997), as support for his argument. In *Sterling, supra*, and in *Skrable, supra*, the appellate courts recognized an exception to the employment-at-will doctrine for wrongful discharge where the employee is fired in violation of a well-established public policy of the state. The supreme court in *Sterling* held that it is a violation of the public policy of this state for an employer to discharge an employee for reporting a violation of state or federal law. *Sterling, supra*. The court also stated that an action for wrongful discharge sounds exclusively in contract. *Id.*

The burden of establishing a prima facie case of wrongful discharge is upon the employee, but once the employee has met its burden, the burden shifts to the employer to prove that there was a legitimate, nonretaliatory reason for the discharge. *General Electric Co. v. Gilbert*, 76 Ark. App. 375, 65 S.W.3d 892 (2002). The general measure of damages in a wrongful discharge action is the sum of lost wages from termination until the day of trial, less the sum of any wages that the employee actually earned or could have earned with reasonable diligence, and the employee can also recover any other tangible employment benefit lost as a result of the termination. *Id.*

Even assuming that Wingfield demonstrated sufficient evidence of wrongful discharge to defeat a motion for summary judgment, Contech contends that these cases do not support Wingfield's argument that it was thus estopped from collecting interest on the promissory note. Contech asserts that the doctrine of estoppel has no application in this case and that Wingfield has cited no authority to support his position.

Four elements are necessary to establish estoppel: "(1) the party to be estopped must know the facts; (2) the party to be estopped must intend that his conduct be acted on or must act so that the party asserting the estoppel had a right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the facts; and (4) the party asserting the estoppel must rely on the other's conduct and be injured by that reliance." *Santifer v. Arkansas Pulpwood Co., Inc.*, 66 Ark. App. 145, 151, 991 S.W.2d 130, 134 (1999).

As argued by Contech, Wingfield does not claim that Contech induced him to sign the promissory note or Stockholders Agreement or that he was not aware of their provisions. Rather, Wingfield is arguing that Contech did not have good cause to terminate his employment, so that CHC should not be permitted to exercise the call option and Contech should not be allowed to accelerate the promissory note and collect the interest due on the note. However, the promissory note states that it matures if Wingfield's employment is terminated "for any reason." Also, the Stockholders Agreement provides for the exercise of a call option on the occurrence of a termination event, which includes terminations with or without cause, "or for any other reason." Thus, regardless of Contech's motivation in terminating Wingfield's employment, CHC was entitled to exercise its right to repurchase

its stock from Wingfield, and Wingfield has not provided any authority to the contrary. The only significance to the reason behind Wingfield's termination under the Stockholders Agreement would be its effect on the price that he was paid for the stock, either book value or original cost. Moreover, Wingfield did not file a counterclaim challenging Contech's termination of his employment or challenging the price to be paid for his stock. Instead, Wingfield asserted these claims as a defense to his obligation of interest on the promissory note.

Contech filed suit against Wingfield simply to collect the interest due on the promissory note. Wingfield admits that he signed this note, and he does not contend that the note is invalid. It is improper to deny interest where the obligation is not purely equitable but instead is a legal obligation based upon a promissory note. *Peek v. Brickey*, 300 Ark. 354, 779 S.W.2d 152 (1989). In his response to Contech's summary judgment motion, Wingfield failed to meet proof with proof and show a material issue of fact on this issue.

Wingfield next argues that there are unresolved factual issues as to whether the provisions in the Stockholders Agreement requiring the employee to forfeit any gain in the stock if terminated with cause are against the public policy of this state. Asserting that our appellate courts have not directly addressed this issue, Wingfield instead cites a recent case from Kentucky, *Man O War Restaurants, Inc. v. Martin*, 932 S.W.2d 366 (Ky. 1996), as support for his argument on this point. In *Man O War*, the court recognized the enforceability of "buy-back" agreements between a corporation and its shareholders. However, the court found that a contract provision requiring the employee, upon the termination of his employment, to return his stock for the sum he originally paid operated as a forfeiture or penalty for breach of contract, and was a form of unreasonably excessive liquidated damages. *Id.* The court stated that whether the employee's termination was for cause or without cause was not decisive, and it accepted the trial court's finding that the employee was terminated for reasonable cause. *Id.* The court held that the provision could only be upheld if the employee was paid book value or fair market value for the stock. *Id.* Wingfield urges this court to follow the reasoning in *Man O War* and to find that enforcement of the call option provision is lawful only if he is fairly compensated for his stock. He asserts that he is entitled to at least the book value of the stock at the time of termination or transfer.

Contech argues, however, that the call option provision is not against the public policy of this state or the state of Delaware, under which the Stockholders Agreement states that it is to be construed. In *Keene Corp. v. Hoofe*, 267 A.2d 618 (Del. 1970), the Delaware court upheld a contract provision allowing the corporation the right to repurchase the stock of an employee after his termination for the same price at which the stock was originally purchased. *See also Pillsbury Co. v. Elston*, 283 N.W.2d 370 (Minn. 1979) (holding that a corporation had an absolute right to repurchase restricted shares of stock at the option price paid by the officer); *Reinberg v. Zarrow*, 667 P.2d 465 (Okla. 1983) (finding that an agreement to repurchase stock was binding even though there was a disparity between the price specified in the agreement and the actual value of the stock); *Kanawha-Roane Lands, Inc. v. Burford*, 178 W.Va. 390, 359 S.E.2d 618 (W. Va. 1987) (holding that a stock repurchase agreement allowing the corporation to repurchase shares at the original purchase price was valid).

Although an Arkansas case dealing with a similar situation held that the original purchase price was not a "fair price" and that it was an unreasonable restraint upon alienation under a previous version of Ark. Code Ann. § 4-26-610 (Repl. 2001), *see Systematics, Inc. v. Mitchell*, 253 Ark. 848, 491 S.W.2d 40 (1973), the legislature subsequently amended the statute in response to this decision. *See* James A. Carmody, *Corporations-Stock Transfer Restrictions Systematics, Inc. v. Mitchell and Act 409 of 1973*, 27 ARK. L. REV. 554 (1973). Subsection (c) of the statute was amended and states that "[n]othing in this chapter is intended to prevent the holder or holders of any or all of the shares of stock of a corporation, or the corporation in which the holder or holders own any or all of the shares of stock, from subjecting the shares owned by the aforesaid parties by written contract or written agreement to restrictions, including stock options." Ark. Code Ann. § 4-26-610(c)(1). In addition, section 4-26-610(c)(2) states that "[a]ny price or formula for determining the price set by the agreement or contract shall be deemed a fair price." Subsection (d) was also added, which states that "unreasonable restraint on alienation shall have no effect upon the validity or enforceability of any written contract between or among those parties subject to the provisions of subsection (c) of this section." The Business Corporation Act of 1987 also provides that a corporation may place restrictions on the transfer of shares for any reasonable purpose and may require the shareholder to first

permit the corporation the option to acquire the restricted shares. Ark. Code Ann. § 4-27-627 (Repl. 2001).

The public policy of a state is found in its constitution and statutes. *Sterling Drug, supra.* Because Wingfield has not demonstrated that the provisions in the Stockholders Agreement in this case are against public policy, his argument that he should not be required to comply with its provisions is without merit. Also, even if there is merit to Wingfield's argument that the provision that he is only paid his original purchase price for the stock in the event of his termination for cause is against public policy, he has not demonstrated how this excuses his obligation to pay interest on the promissory note. Contech brought this action to recover the interest due on the note, and although Wingfield is in effect requesting a set-off for the stock's increase in value, he did not file a counterclaim or other action against CHC challenging these provisions in the Stockholders Agreement. Consequently, we conclude that there were no genuine issues of material fact left unresolved and that Contech was entitled to summary judgment as a matter of law on its claim for the interest due on the note.

Affirmed.

Vaught and Baker, JJ., agree.