# IN THE SUPREME COURT OF IOWA

No. 11–0601

Filed June 14, 2013

**JOHN R. BAUR,**

Appellant,

vs.

**BAUR FARMS, INC.** and
**ROBERT F. BAUR,**

Appellees.

Appeal from the Iowa District Court for Madison County, Paul R. Huscher, Judge.

Minority shareholder in a closely held farm corporation appeals from the dismissal of his suit alleging oppression. **REVERSED AND CASE REMANDED WITH DIRECTIONS.**

Douglas A. Fulton and Allison M. Steuterman of Brick Gentry, P.C., West Des Moines, for appellant.

David L. Charles of Crowley Fleck PLLP, Billings, Montana, and Mark McCormick of Belin McCormick, P.C., Des Moines, for appellees.

**HECHT, Justice**.

A minority shareholder of a family farm corporation sued the corporation and its majority shareholder, who served as a director and officer of the corporation. The minority shareholder alleged illegal, oppressive, malicious, and fraudulent acts by the majority shareholder had resulted in waste of the corporation's assets and constituted a breach of fiduciary duty. The minority shareholder requested dissolution of the corporation or payment of the fair value of his ownership interest. The district court dismissed the action at the conclusion of the minority shareholder's presentation of evidence in a bench trial. The minority shareholder appeals, contending the district court erred in dismissing the action. We reverse and remand with instructions.

## I. Factual and Procedural Background.

Baur Farms, Inc. (BFI) is a family farm corporation formed in 1966 by brothers Merritt and Edward Baur. At the time of its organization, the corporation took ownership of 1736 acres of land previously farmed by the brothers as partners. Two thousand four hundred fifty shares of stock were issued at the outset, with 1262 allocated to Edward and 1188 allocated to Merritt. Merritt, Edward, Merritt's son, John (Jack), and Edward's son, Robert (Bob), were among the original directors of the corporation.

Merritt eventually transferred his stock to his sons, Jack and Dennis. Edward transferred his stock to his son, Bob. Initially, Jack worked on the farm, but eventually he left to pursue a legal education and a successful business career. Dennis also worked for the farm until health issues prevented him from continuing. Dennis's son, James, later began working for the corporation and eventually became the manager of its farming operations.

The original corporate bylaws included restrictions on transfers of the company's stock and established a stock redemption price of $100 per share. The bylaws were amended in 1984 to include a buyout provision. Under this provision, a shareholder wishing to sell his shares must first offer to sell them to the corporation or the other shareholders. If a different price is not agreed upon, the purchase price of the stock is set at the "book value per share of the shareholders' equity interest in the corporation as determined by the Board of Directors, for internal use only, as of the close of the most recent fiscal year." The 1984 amendment established a book value of $686 per share.[1]

Jack had received the bulk of his shares through gifts from Merritt in the 1970s and '80s. On Merritt's passing in 1989, Jack inherited twenty-four additional shares from Merritt's estate, bringing his total ownership to 644 shares. As the executor of the estate, Jack asserted a value of $300 per share for the BFI stock in the probate inventory.[2]

Jack and Bob had disagreements about certain corporate decisions while they served together as directors and officers. For example, Bob believed the corporation should purchase certain farm real estate, but Jack opposed the purchase. Jack's vocal opposition to the acquisition of additional real estate was driven in part by the fact that the corporation paid no dividends and by his desire to sell his interest in the company. Jack believed the use of corporate capital for the purchase of additional farm real estate would diminish the capital otherwise available to

---

[1]We find no evidence in the record that the BFI board of directors or the shareholders formally established or declared a different book value per share for any fiscal year after 1983.

[2]The record reveals this figure was based on a special use valuation claimed for tax purposes.

purchase his shares. Bob, the majority shareholder, took action to avoid the deadlock of the board on the question of purchasing more real estate. He initiated the expansion of the board from two to three directors and his wife was elected as the third director in 1997. Although Jack had previously served as a vice president of the corporation, he was not reelected and has held only the position of director since 1997.

Jack has wished to sell his shares of stock in the corporation since the early 1990s. He has not, however, tendered them for sale to the corporation or other shareholders under the buyout provision of the bylaws. He continues to believe his shares are worth more than their "book value . . . as determined by the Board of Directors, for internal use only, as of the close of the most recent fiscal year." BFI[3] retained counsel in the 1990s to handle negotiations regarding a possible purchase of Jack's stock. Jack and BFI communicated their respective views of the value of Jack's interest on several occasions over a period of years, but a price was never agreed upon. Jack also had conversations with James about Jack's interest in selling his shares. James suggested the value of Jack's shares should be discounted because they represented a minority interest in the closely held corporation and because of the potential tax consequences attending the corporation's liquidation of assets in funding any proposed buyout.

In late 1992, at the request of Jack and Bob, BFI's counsel estimated with the assistance of accountants the book value of Jack's shares at $331,228.52, or approximately $514.33 per share. BFI's counsel subsequently communicated to Jack the corporation's offer to

---

[3]Where appropriate, we will refer to Bob and BFI collectively as BFI.

purchase his shares for $261,464, or approximately $406 per share. Jack rejected the offers, questioning the apparent discount claimed by BFI for his minority interest and believing the offers were based on a substantial undervaluation of the company's farm real estate.

After various intervening conversations, Jack hired counsel in 1995 and obtained a new appraisal of the real estate. Armed with the new appraisal, Jack's counsel urged a new valuation of BFI and proposed a value of Jack's shares of approximately $600,000, or $931.68 per share. Bob rejected this new proposed valuation, contending it was based on an excessive appraisal of the real estate. Bob responded in the spring of 1996 with a new valuation of BFI, estimating the value of Jack's holdings at $398,418, or approximately $618.66 per share before any minority discount.

Negotiations continued as Jack countered a few months later with a proposed valuation of $500,000 for his shares, or approximately $776.40 per share. No agreement on a sale price was reached, however, and the discussions stalled for several years.

Jack again expressed interest in selling his shares at a 2002 BFI board meeting. He made a motion that the corporation purchase his shares for $600,000. The motion failed. Further negotiations ensued, but the parties continued to dispute valuations and valuation methods. At a 2005 board meeting, Jack moved for dissolution of BFI, or in the alternative, moved that BFI purchase his shares at their fair market value. Both motions failed.

Jack commissioned a new appraisal of the corporation's land in 2006 and urged the establishment of an updated value for his interest in BFI. A few months later, James communicated to Jack a proposed valuation of $4.88 million, which assumed land valued at $1500 per

acre.[4]   Again negotiations stalled because of differences of opinion on land values and on whether a minority discount should be used in calculating the value of Jack's shares.

Jack reopened the communications prior to a 2007 meeting of the board, proposing a new valuation of BFI at $7,400,000, which assumed $3000 per acre as the value of the corporation's farm real estate.  Based on that proposed valuation, Jack offered to sell his shares for $1,825,000, or approximately $2833.85 per share.  At the 2007 board meeting, Jack moved again for dissolution of the corporation or, alternatively, for BFI's purchase of his shares at their fair market value.  Both motions failed again.

Shortly thereafter, Jack filed suit against Bob and BFI, alleging they had engaged in fraud, illegality, and oppressive conduct, and that Bob had breached his fiduciary duty as a director and officer of the corporation.  The district court granted summary judgment for Bob and BFI on the ground that the specific alleged acts of oppression had occurred outside the applicable five-year statute of limitations.  Jack appealed, and the court of appeals reversed and remanded for trial.  *Baur v. Baur Farms, Inc.*, No. 09–0480, 2010 WL 447063 (Iowa Ct. App. Feb. 10, 2010).

BFI immediately filed another motion for summary judgment.  They asserted that although the court of appeals had concluded certain of the alleged acts of oppression had occurred within five years of the commencement of the action and were not barred by the statute of

---

[4]Notwithstanding this communication from James, BFI's books listed the value of the land at $1,344,571.75, or approximately $613.12 per acre through the end of 2007.

limitations, the court had not adjudicated BFI's claims that as a matter of law their alleged actions had not constituted fraud, illegality, or oppression. The district court denied this second motion for summary judgment, concluding the previous decisions of the district court and court of appeals supported a finding that fact questions remained regarding Jack's allegations of fraud, illegality, and oppression.

The case was tried to the court sitting in equity. At the close of Jack's evidence, Bob and BFI moved for a "directed verdict." The district court made a brief record in which the court expressed its view that Jack had presented no evidence Bob or BFI had acted fraudulently, illegally, or oppressively and stated that the evidence did not indicate the "offered price or the amounts proposed by the corporation [we]re either above or below . . . book value as determined by standard accounting procedures." The court granted BFI's motion and dismissed the action.

Jack filed a motion pursuant to Iowa Rule of Civil Procedure 1.904(2) contending the district court had failed to make factual findings "concerning the basis of the Petition." Specifically, the motion requested the court find Bob and BFI had engaged in oppressive conduct by failing to "obtain any return of Baur Farms, Inc.," and by continuing to "insist upon a large majority discount of any shares that [Bob or BFI] purchased." The motion also requested the court find Jack had been "consistently frozen out of the day to day activities of Baur Farms, Inc." The district court denied the motion on March 16, 2011, and Jack filed his notice of appeal on April 15.

BFI moved to dismiss the appeal, contending the notice of appeal was untimely because Jack's rule 1.904(2) motion did not address questions of fact and challenged only the district court's determination that the defendants were entitled to judgment as a matter of law. We

ordered the jurisdictional issue submitted along with the other issues raised in this appeal.

## II. Scope of Review.

This case was tried in equity. Our review of the merits of Jack's claim of minority shareholder oppression is therefore de novo. *See Lange v. Lange*, 520 N.W.2d 113, 115 (Iowa 1994).

## III. Discussion.

**A. Jurisdiction.** We first address the jurisdictional issue BFI raised in its motion to dismiss this appeal. As we have already noted, the district court entered its ruling on BFI's motion to dismiss Jack's case on March 2, 2011. Jack filed a posttrial motion under Iowa Rule of Civil Procedure 1.904(2) on March 14, requesting that the district court make certain findings of fact and conclusions of law. In particular, the motion requested findings as to whether BFI's failure to make income distributions allowing a return on Jack's minority shareholder interest constituted oppression and whether Jack was consistently frozen out of the day-to-day activities of the corporation. The district court denied the motion on March 16, and Jack filed his notice of appeal on April 15. BFI contends we lack subject matter jurisdiction because Jack's rule 1.904(2) motion was improper, and thus Jack's notice of appeal of the district court's March 2 ruling was untimely.

Iowa Rule of Appellate Procedure 6.101(1) provides that a notice of appeal must ordinarily be filed within thirty days of the filing of the district court's final order or judgment. Iowa R. App. P. 6.101(1)(*b*). In the event a party files a timely motion under Iowa Rule of Civil Procedure 1.904(2), however, rule 6.101 authorizes the filing of a notice of appeal within thirty days of the filing of the district court's ruling on the rule 1.904(2) motion. *Id.* We have previously explained that a failure to file a

timely notice of appeal leaves us without subject matter jurisdiction to hear the appeal. *Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 771 (Iowa 2009). Because Jack filed his notice of appeal more than thirty days after the district court's order granting BFI's motion to dismiss, we have jurisdiction in this appeal only if Jack's motion requesting findings on elements of his cause of action constituted a proper rule 1.904(2) motion. *See Beck v. Fleener*, 376 N.W.2d 594, 596 (Iowa 1985).

Rule 1.904(2) provides that the "findings and conclusions" of the district court may be enlarged or amended and the judgment or decree modified accordingly "[o]n motion with or filed within the time allowed for a motion for new trial." Iowa R. Civ. P. 1.904(2). We have explained that a motion to enlarge or amend is available only to address rulings on factual issues tried without a jury and that any legal issues raised in the motion must have been addressed in the context of an issue of fact tried by the court without a jury. *See Meier v. Senecaut*, 641 N.W.2d 532, 538 (Iowa 2002). When a rule 1.904(2) motion amounts to nothing more than a rehash of legal issues previously raised, we will conclude the motion does not toll the time for appeal. *Explore Info. Servs. v. Ct. Info. Sys.*, 636 N.W.2d 50, 57 (Iowa 2001). By contrast, when used to obtain a ruling on an issue that the court may have overlooked, or to request the district court enlarge or amend its findings when it fails to comply with rule 1.904(1), the motion is proper and will toll the time for appeal. *See In re Marriage of Okland*, 699 N.W.2d 260, 266–67 (Iowa 2005).

Here, the district court granted judgment for BFI at the close of Jack's case, stating "[t]he court cannot and does not find that the inability of these parties to reach an agreement regarding a purchase price constitutes oppressive conduct under these circumstances." BFI

views the ruling as a determination that—as a matter of law—Jack's evidence failed to engender a fact question on his oppression claim. Characterizing Jack's rule 1.904(2) motion as a "rehash of a legal issue," BFI contends the motion failed to extend the deadline for filing a notice of appeal. We disagree. The district court's ruling sustaining BFI's motion after Jack rested is in our view ambiguous. It could be read as an expression of a finding of fact. *See Batliner v. Sallee*, 254 Iowa 561, 563, 118 N.W.2d 552, 553 (1962) (following motion "for directed verdict" in bench trial, trial court's determination that the plaintiff "failed to carry his burden of proof" on contributory negligence gave it "the appearance of having been a decision on the facts"). Yet, the ruling did not separately find the facts in writing and state conclusions of law as required by rule 1.904(1). *See* Iowa R. Civ. P. 1.904(1) (instructing district court "shall find the facts in writing, separately stating its conclusions of law").

Jack's rule 1.904(2) motion requested a finding on whether Jack had established oppression by showing BFI had denied him a return on his equity interest in the company while insisting upon a buyout price based on a large discount for his minority interest. Given that Jack's rule 1.904(2) motion requested the court make, enlarge, or amend findings of fact, we cannot conclude the motion was improper. *See In re Marriage of Okland*, 699 N.W.2d at 266–67. Accordingly, we conclude Jack's notice of appeal was timely and that we have jurisdiction in this appeal. *See Beck*, 376 N.W.2d at 596.

### B. Merits of the Oppression Issue.

1. *Contentions of the parties*. Jack contends the district court erred in failing to find oppression and failing to order either dissolution or a buyout of his shares at fair market value. Specifically, Jack argues

BFI's failure to provide a return on his shareholder equity interest over the years and its refusal to offer a price for his shares fairly approximating their true value[5] constitutes shareholder oppression under Iowa's business corporations statute. BFI counters that Jack has presented no evidence that BFI has acted oppressively because Jack's stock has increased in value substantially as a result of BFI's business judgment and Jack has no reasonable expectation of redemption at a price other than book value as contemplated in BFI's bylaws.

2. *Relevant statutory provisions and interpretation.* Iowa's Business Corporations Act (IBCA) provides that a district court may dissolve a corporation in several types of proceedings, including one initiated by a shareholder alleging "[t]he directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent." Iowa Code § 490.1430(2)(*b*) (2011). The IBCA, however, offers no definition of "oppressive" or "oppression," and the Model Business Corporation Act, on which the IBCA is based, likewise fails to furnish definitions of these terms. We have not yet interpreted "oppression" in this context, but our court of appeals, after examining the decisions of other jurisdictions, has concluded oppression

---

[5]Although the subject of a minority discount for Jack's shares was a subject of disagreement in the parties' earlier negotiations, the record does not reveal whether BFI's most recent offers to purchase Jack's stock assumed such a discount. We note, however, our recent disapproval of share valuations incorporating a discount for a minority interest in other corporations. *See, e.g.*, *Nw. Inv. Corp. v. Wallace*, 741 N.W.2d 782, 787–88 (Iowa 2007) ("Our legislature made a policy decision when it adopted the current definition of 'fair value.' By not allowing a discount for lack of marketability or minority status, the legislature implicitly required shares to be valued on a marketable, control interest basis."); *Sec. State Bank v. Ziegeldorf*, 554 N.W.2d 884, 889 (Iowa 1996) ("Such a discount 'in effect would let the majority force the minority out without paying it its fair share of the value of the corporation.' " (quoting *Woodward v. Quigley*, 257 Iowa 1077, 1087, 133 N.W.2d 38, 43 (1965))).

is "an expansive term used to cover a multitude of situations dealing with improper conduct which is neither illegal nor fraudulent." *Maschmeier v. Southside Press, Ltd.*, 435 N.W.2d 377, 380 (Iowa Ct. App. 1988) (citing *Balvik v. Sylvester*, 411 N.W.2d 383, 386 (N.D. 1987)). The court in *Maschmeier* cited with approval a decision of the Oregon Supreme Court describing the following example of oppression:

> the case of the shareholder-director-officers refusing to declare dividends, but providing high compensation for themselves and otherwise enjoying to the fullest the "patronage" which corporate control entails, leaving minority shareholders who do not hold corporate office with the choice of getting little or no return on their investments for an indefinite period of time or selling out to the majority shareholders at whatever price they will offer.

*Id.* at 380 (citing *Baker v. Commercial Body Builders, Inc.*, 507 P.2d 387, 392 (Or. 1973)).[6]

3. *Overview of alternative standards for evaluating minority shareholders' claims of oppression.* Other jurisdictions have developed several sometimes overlapping standards for evaluating minority shareholders' claims of oppression in closely held corporations. Some have concluded oppression is " 'burdensome, harsh and wrongful conduct' . . . or 'a visible departure from the standards of fair dealing and a violation of fair play on which every shareholder who entrusts his money to a corporation is entitled to rely.' " *Fix v. Fix Material Co.*, 538 S.W.2d 351, 358 (Mo. Ct. App. 1976) (quoting *White v. Perkins*, 189 S.E.2d 315, 320 (Va. 1972)); *see also Skierka v. Skierka Bros., Inc.*, 629 P.2d 214, 221 (Mont. 1981); *Jorgensen v. Water Works, Inc.*, 582 N.W.2d 98, 107 (Wis. Ct. App. 1998). Other courts have linked oppression to the

---

[6]Jack has abandoned any claim that Bob or any other shareholder took excessive compensation or unreasonable perquisites.

derogation of the fiduciary duty "of utmost good faith and loyalty" owed by shareholders to each other in close corporations. *Balvik,* 411 N.W.2d at 387; *see also Maschmeier,* 435 N.W.2d at 380; *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 328 N.E.2d 505, 515 (Mass. 1975); *Baker,* 507 P.2d at 394.

A third approach, now perhaps the most widely adopted, links oppression to the frustration of the reasonable expectations of the corporation's shareholders. *See* 2 F. Hodge O'Neal & Robert B. Thompson, *Oppression of Minority Shareholders and LLC Members* § 7:11, at 7-105 to 7-108 (rev. 2d ed. 2012) [hereinafter O'Neal & Thompson]; Douglas K. Moll, *Shareholder Oppression & Dividend Policy in the Close Corporation,* 60 Wash. & Lee L. Rev. 841, 853–58 (2003) [hereinafter Moll]; *see also Stefano v. Coppock,* 705 P.2d 443, 446 n.3 (Alaska 1985) (favoring definition of oppression incorporating the reasonable expectations of minority shareholders); *Fox v. 7L Bar Ranch Co.,* 645 P.2d 929, 933–34 (Mont. 1982) (same); *Brenner v. Berkowitz,* 634 A.2d 1019, 1028–29 (N.J. 1993) (same); *In re Judicial Dissolution of Kemp & Beatley, Inc.,* 473 N.E.2d 1173, 1179 (N.Y. 1984) (same); *Meiselman v. Meiselman,* 307 S.E.2d 551, 563–64 (N.C. 1983) (same); *cf. Maschmeier,* 435 N.W.2d at 380.

Courts applying the reasonable expectations standard have granted relief when the effect of a majority shareholder's conduct is to deprive a minority shareholder of any return on shareholder equity. *See, e.g., Bonavita v. Corbo,* 692 A.2d 119, 125 (N.J. Super. Ct. Ch. Div. 1996) (explaining corporation's no-dividend policy meant that only actively employed shareholders would receive corporate benefits); *Ford v. Ford,* 878 A.2d 894, 904 (Pa. Super. Ct. 2005) (explaining expectation of lifetime employment was unreasonable but minority shareholders had

reasonable expectation of receiving "*some* benefit from their minority shares").

4. *Oppression arising from transfer price restrictions.* Some courts have declined to enforce transfer price restrictions determined by formulas producing transfer prices so small in relation to the true value of the shares as to make the restrictions unconscionable or oppressive. *See, e.g., Palmer v. Chamberlin,* 191 F.2d 532, 541 (5th Cir. 1951) (explaining in dictum that court would not enforce a transfer restriction if it concluded the price was so small in relation to true value as to make the arrangement unconscionable or oppressive); *New England Trust Co. v. Abbott,* 38 N.E. 432, 434 (Mass. 1894) ("[S]pecific performance of an agreement to convey will not be refused merely because the price is inadequate or excessive. The difference must be so great as to lead to a reasonable conclusion of fraud, mistake, or concealment in the nature of fraud, and to render it plainly inequitable and against conscience that the contract should be enforced."); *In re Estate of Mihm,* 497 A.2d 612, 613 (Pa. Super. Ct. 1985) (affirming trial court's refusal to grant specific performance of an agreement obligating a deceased shareholder's estate to sell to the corporation for $475,000 a one-third interest in a family corporation when deceased's interest had increased in value to $1,800,000); *cf. Swanson v. Shockley,* 364 N.W.2d 252, 256 (Iowa 1985) (declining to enforce previously repealed transfer restriction that would have allowed plaintiff to purchase defendant's stock at eight percent of market value as restriction would have given plaintiff windfall and provided "no reasonable way for defendant to dispose of his stock").

Other courts adjudicating the enforceability of transfer restrictions have declined enforcement of transfer prices that are so low in relation to the fair value of the shares as to constitute unreasonable restraints on

alienation. *See, e.g., B & H Warehouse, Inc. v. Atlas Van Lines, Inc.*, 490 F.2d 818, 826–27 (5th Cir. 1974) (applying Delaware law and concluding requirement shares be sold to corporation at set price equivalent to one-fifth of market price could not be applied to shares not voted in favor of the restriction); *Systematics, Inc. v. Mitchell*, 491 S.W.2d 40, 43 (Ark. 1973) (explaining agreement requiring resale to corporation at twenty percent of market value was unfair and failed to comply with statute authorizing restrictions for purchase at "fair" price), *superseded by statute*, Ark. Code § 4–26–610(c)(2) (2001), *as recognized in Wingfield v. Contech Constr. Prods., Inc.*, 115 S.W.2d 336, 341 (Ark. Ct. App. 2003); *cf. Man O War Rests., Inc. v. Martin*, 932 S.W.2d 366, 368 (Ky. 1996) (explaining provision in employment contract requiring employee to sell stock back to the corporation for price originally paid was void based on the court's strong public policy against forfeiture); *Castriota v. Castriota*, 633 A.2d 1024, 1028 (N.J. Super. Ct. App. Div. 1993) (concluding noninterest bearing note maturing on whim of surviving shareholder is unreasonable restraint on alienation).

While courts often confront shareholder claims of oppression when parties have failed completely to plan for the resolution of their faltering relationships, they must also be prepared to resolve cases like this one in which the shareholders have adopted a buyout remedy but are unable to agree on its implementation. Here we look for guidance to the decisions of courts that have considered whether a shareholder's petition for dissolution of a corporation triggers a buy–sell provision and whether the buyout formula in the provision should control the remedy. Some jurisdictions address these questions under statutory schemes requiring courts' consideration of preexisting transfer price restrictions but denying their enforcement when they would produce an unreasonable

result under the circumstances. *See, e.g.*, Minn. Stat. Ann. § 302A.751(2) (West, Westlaw current through ch. 39, 41, 45, and 74 of 2013 Reg. Sess.). Ultimately, courts assess whether dissolution is the only feasible means by which shareholders can reasonably expect to obtain a fair return on their investment. *See DiPace v. Figueroa*, 637 N.Y.S.2d 222, 224 (App. Div. 1996) (denying relief under dissolution statute because mother and sister "signaled their willingness to update the price set by the parties' buyout agreement," and plaintiff could "obtain a fair return on her investment without resort to such a Draconian remedy").

In the absence of statutory guidance, courts in other jurisdictions have applied a similar common law standard denying enforcement of unreasonable transfer price restrictions. The decisions of these courts apply equitable considerations in permitting minority shareholders to petition for relief under involuntary dissolution statutes despite preexisting transfer price agreements. *See, e.g., In re Involuntary Dissolution of Villa Maria, Inc.*, 312 N.W.2d 921, 923 (Minn. 1981); *Anderson v. Clemens Mobile Homes, Inc.*, 333 N.W.2d 900, 903–04 (Neb. 1983).

5. *Oppression standard in Iowa.*

a. *General transfer restrictions.* The IBCA includes a share transfer provision allowing the imposition, through articles of incorporation, bylaws, or shareholder agreements, of restrictions on the transfer of a corporation's shares. *See* Iowa Code § 490.627(1). Transfer restrictions are authorized for any "reasonable purpose," may obligate a shareholder to offer the corporation or other persons an opportunity to acquire the shares, and may require the corporation or another person to approve the transfer if the requirement is not "manifestly unreasonable."

*Id.* § 490.627(4). We note the statute generally authorizes transfer restrictions but does not enumerate specific restrictive terms that will be deemed reasonable and enforceable. In the absence of specific statutory guidance, courts have sustained restrictions that are reasonable in light of all the circumstances of the particular case. *See, e.g., Tu-Vu Drive-In Corp. v. Ashkins*, 391 P.2d 828, 830 (Cal. 1964) (explaining the term "reasonable" imports a twofold requirement: the transfer restriction "must not constitute an unreasonably restrictive curtailment of the right of alienation . . . and it must not otherwise unreasonably deprive the shareholder of 'substantial rights.'" (citations omitted)). *See generally* 1 F. Hodge O'Neal & Robert B. Thompson, *Close Corporations and LLCs* § 7:7, at 7-31 (3d ed. 2012).

b. *Transfer price restrictions, fair value, and reasonable expectations.* The IBCA makes no express mention of the enforceability of restrictions setting transfer prices or formulas. *See* Iowa Code § 490.627. Section 14.34 of the Model Business Corporation Act is similarly silent regarding the enforceability of transfer price restrictions in dissolution proceedings, but a comment explains that courts applying the model act "should look to [the corporation's formula establishing the transfer price] unless the court decides it would be unjust or inequitable to do so in light of the facts and circumstances of the particular case." Model Bus. Corp. Act Annotated § 14.34 cmt. 4(*b*), at 14-46 (3d ed. 2005); *accord Maschmeier*, 435 N.W.2d at 382–83 (ordering buyout based on trial court's "fair and reasonable" valuation of shares notwithstanding bylaws provision fixing value of stock by vote of shareholders at last annual meeting).

The general assembly, in adopting the IBCA, has codified a "fair value" principle as an alternative to other dissolution remedies. A

corporation or its shareholders may elect, upon initiation of dissolution proceedings, to purchase the shares of the petitioning shareholder at the "fair value of the shares." *Id.* § 490.1434(1). In the event the corporation or a shareholder elects this alternative, and the parties are able to reach agreement "as to the fair value and terms of purchase" within sixty days, the statute directs that the court shall order the purchase of the petitioner's shares according to the terms of the parties' agreement. *Id.* § 490.1434(3). If the parties are unable to reach an agreement, the statute allows the court—upon the application of any party—to stay the dissolution proceeding, determine the fair value of the petitioner's shares, and order the purchase of the shares "upon such terms and conditions as the court deems appropriate." *Id.* § 490.1434(4)–(5).

We read these statutory provisions as extensions of the principle that every shareholder may reasonably expect to share proportionally in a corporation's gains. *See, e.g., Burton v. Exxon Corp.*, 583 F. Supp. 405, 418 (S.D.N.Y. 1984) ("[S]tockholders are owners of the corporation and expect to share in its profits."); *Michaud v. Morris*, 603 So. 2d 886, 888 (Ala. 1992) ("Certain basic expectations of investors are enforceable in the courts, and among those is a right to share proportionally in corporate gains."); *Baker*, 507 P.2d at 397 (explaining shareholders have "a legitimate interest in the participation in profits earned by the corporation"). When this reasonable expectation is frustrated, a shareholder-oppression claim may arise. *See Stefano*, 705 P.2d at 446 n.3; *Maschmeier*, 435 N.W.2d at 380; *7L Bar Ranch*, 645 P.2d at 933–34; *Brenner*, 634 A.2d at 1029; *In re Judicial Dissolution of Kemp & Beatley, Inc.*, 473 N.E.2d at 1179; *Meiselman*, 307 S.E.2d at 563–64.

We adopt today a reasonableness standard for the adjudication of minority shareholder claims of oppression in Iowa. This standard

comports with principles announced in our earlier decisions protecting the interests of minority shareholders in closely held corporations. Management-controlling directors and majority shareholders of such corporations have long owed a fiduciary duty to the company and its shareholders. *Cookies Food Prods., Inc. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 451 (Iowa 1988). This fiduciary duty encompasses a duty of care and a duty of loyalty to the corporation. *Id.* The fiduciary duty also mandates that controlling directors and majority shareholders conduct themselves in a manner that is not oppressive to minority shareholders.

The determination of whether the conduct of controlling directors and majority shareholders is oppressive under section 490.1430(2)(*b*) and supports a minority shareholder's action for dissolution of a corporation must focus on whether the reasonable expectations of the minority shareholder have been frustrated under the circumstances. We need not catalogue here all the categories of conduct and circumstances that will constitute oppression frustrating the reasonable expectations of minority shareholders' interests. We hold that majority shareholders act oppressively when, having the corporate financial resources to do so, they fail to satisfy the reasonable expectations of a minority shareholder by paying no return on shareholder equity while declining the minority shareholder's repeated offers to sell shares for fair value.

c. *Application of reasonable expectations standard in this case.* Jack has not worked for and has drawn no salary from BFI for approximately fifty years. He—like the other BFI directors—received $5000 per year for his service as an officer and member of the corporate board prior to 1997. But in 1997, Jack was removed as an officer and the annual compensation for his service and that of the other directors

was reduced to $250. Over the nearly twenty years as Jack negotiated unsuccessfully for the sale of his shares, the appraised value of BFI's assets increased between fivefold and sevenfold to approximately $6 million.[7] BFI, however, has never paid a dividend and, given the nature of its business and the variability of its cash flow, might never do so.

Jack confronts obvious practical problems as a minority shareholder seeking a remedy under the bylaw buyout provision. Despite his persistent efforts over more than two decades, he has not been able to sell his stock at a mutually agreed upon price. The book value option is similarly problematic from Jack's perspective. BFI calculated and the shareholders ratified a 1983 year-end price per share of $686 at its 1984 meeting. That valuation approved in 1984 has never been formally revisited or revised. The language of the book value buyout provision fails to address several important questions: (1) whether book value must be set by express resolution of the BFI board or may be determined from an inspection of the books of the corporation without formal action by the directors or shareholders; (2) whether annual determination of the book value for purposes of the bylaw provision was intended; and (3) whether the board, when setting the book value under the provision, must use asset values that are reasonably related to "actual" or "fair market" values and be based on generally accepted accounting principles.

BFI has not adjusted many of the asset values on its internal financial statements since at least 1989, and we find no corporate

---

[7]Jack makes no claim that BFI's other directors and its officers have mismanaged the business of the corporation, wasted its assets, or engaged in self-dealing in violation of their duties of care and loyalty to the company or its shareholders.

resolution in the record affirming that the values have not changed or should not change to accurately reflect the economic condition of the company.[8] Thus, BFI's books carried the company's land holdings at a value of $613 per acre as of December 31, 2007, while Jack's 2006 appraisal supporting his stock valuation in the negotiations evidenced the fair market value of BFI's land ranged from $3000 to $6000 or more per acre.[9] The values of BFI's herd of stock cattle and various farm products, including corn and hay, have also remained substantially unchanged on the company's books for twenty years.

---

[8]We have previously explained that we apply ordinary principles of contract interpretation to stock transfer restrictions. *See Lange*, 520 N.W.2d at 117 (applying contract principles to interpret the term "any" in a buy–sell agreement); *see also* 17 Richard A. Lord, *Williston on Contracts* § 51:69, at 814–15 (4th ed. 2000) ("Agreements imposing restrictions on the transfer of shares are subject to the same rules of interpretation and construction as ordinary contracts."). The terms of the transfer restriction remain the key to our interpretation. *See Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). Neither BFI's bylaws nor the transfer restriction itself, however, provide a definition of "book value" or a method for determining the asset values carried on the company's balance sheet in the event a minority shareholder should challenge them. The standard definitions of "book value" (assets minus liabilities) provide no guidance as to how the actual figures used for computing book value should be determined. *See, e.g.*, *Webster's Third New International Dictionary* 253 (unabr. ed. 2002) (defining book value as "the value of capital stock as indicated by the excess of assets over liabilities—distinguished from market value"); *see also Black's Law Dictionary* 207 (9th ed. 2004) (defining book value as "the value at which an asset is carried on a balance sheet"); *cf.* 6 Matthew G. Doré, *Iowa Practice Business Organizations* § 31:9, at 240 (2012) (listing several mechanisms by which the parties to a share transfer restriction agreement choose to value shares for purposes of a transfer restriction, including "(a) a fixed amount . . . ; (b) book value; (c) a formula, . . . ; [or] (d) market value . . . " without further explanation as to how the asset values affecting the determination of book value shall be determined). Although the BFI bylaw provision chose book value as the default mechanism establishing the buyout price for BFI shares in the absence of an agreement on another price formulation, it does not prescribe how the parties shall determine the value of the corporation's assets from which the liabilities are to be subtracted in computing net shareholder equity and value per share.

[9]Jack's 2007 offer to sell his shares assumed a value from the low end of that range for BFI's land at $3000 per acre, but BFI's counteroffer assumed a value significantly lower still at $1500 per acre. The record does not reveal whether BFI's counteroffer was based on the opinion of a qualified real estate appraiser or whether it assumed a minority discount.

Where stock transfer restrictions have provided for purchase by a corporation at book value, some courts have concluded the restrictions may be enforced if the value has been determined in accordance with generally accepted accounting practices. *See, e.g.*, *Schaffer v. Below*, 278 F.2d 619, 625 (3d Cir. 1960). *See generally* 12 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 5460.50, at 169 (2012 rev. vol.) [hereinafter Fletcher]. Significant discrepancies between market value and book value have cast doubt on the enforceability of provisions requiring transfers at book value. *See, e.g.*, *Whitman v. Whitman*, 149 N.W.2d 529, 532 (Wis. 1967) (explaining book value of close corporation is not any arbitrary value that may be entered on books but is value predicated on market value of corporation's assets); *see also Piedmont Publ'g Co. v. Rogers*, 14 Cal. Rptr. 133, 140–42 (Dist. Ct. App. 1961); *Corbett v. McClintic-Marshall Corp.*, 151 A. 218, 222–23 (Del. Ch. 1930); *Hollister v. Fiedler*, 92 A.2d 52, 56–57 (N.J. Super. Ct. App. Div. 1952). Courts will thus consider whether the accounting methods used in establishing book value are fair and equitable to all the parties involved, and where arbitrary valuations appear on the books, courts have substituted values derived from acceptable accounting procedures. *See* 12 Fletcher § 5460.50, at 175–76; *see also Land & Simmons Co. v. Arconti*, 162 A.2d 478, 482–83 (Md. 1960); *Aron v. Gillman*, 128 N.E.2d 284, 287 (N.Y. 1955).

With these authorities and principles in mind, we consider the evidence of oppression in the record here. Because BFI is a closely held corporation, Jack has no access to an active market in its shares that might allow his realization of a return on his equity position. *See, e.g.*, Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law* 230–31 (1991) (noting "the lack of an active market in

shares" prohibits close-corporation shareholders from creating "homemade dividends" by selling stock); Moll, 60 Wash. & Lee L. Rev. at 860 (explaining "there is no liquid market that allows for the realization of capital appreciation" in case of close corporation). The negotiations for the sale of Jack's stock to the other shareholders at a mutually agreed upon price have been unavailing. Without ready access to an active market, Jack has effectively been precluded from capturing the increased value of his shares because BFI has retained and reinvested its revenue in the company over the years rather than paying out dividends. *See* 1 O'Neal & Thompson § 3:4, at 3-21 to 3-23 (explaining that "[b]y declaring no dividends at all . . . majority shareholders may force a minority shareholder to sell the minority interest at considerably less than its actual value" and "[e]ven if the minority shareholder is in a sufficiently strong position to hold onto stock during a dividend squeeze, the [squeezed shareholder] is still deprived of any return on the investment during the years that dividends are withheld"); *cf. id.* at 3-44 to 3-45 (noting "[t]he judicial focus has been on the special nature of close corporations and how dividend withholding and other actions might frustrate the reasonable expectations of participants"). As a minority shareholder and nonofficer, Jack will remain effectively precluded from capturing any return on his shareholder equity for as long as the board concludes income distributions are inappropriate. *See, e.g.*, *id.* at 3-30 to 3-31 ("Many plausible reasons exist why funds possibly available for distribution as dividends should be prudently retained by the corporations and the courts permit the directors wide latitude in making the decision.") (citing cases); *see also Sec. State Bank v. Ziegeldorf*, 554 N.W.2d 884, 892 (Iowa 1996) (noting practice of declaring dividends in closely held corporation dependent on factors difficult to predict).

As a minority shareholder, Jack also lacks voting power to force the board of directors to set a book value that is reasonably related to the fair value of the company's assets. *Cf. Horne v. Drachman*, 280 S.E.2d 338, 340–41 (Ga. 1981) (examining agreement requiring parties revise buyout price yearly and providing CPA shall revise price if no price set after thirteen months); *McBride v. Pennant Supply Corp.*, 623 N.E.2d 1047, 1050 (Ill. App. Ct. 1993) (examining agreement providing that if annual net worth determination was not accomplished within thirty days of notice of discharge, accountant regularly employed by corporation must prepare a statement of net worth); *Maschmeier*, 435 N.W.2d at 382–83 (examining agreement requiring stock buyout price be agreed upon at annual meeting or, in the event of disagreement, appointment of committee of appraisers to determine value); *In re Estate of Mihm*, 497 A.2d 614 (referring to agreement requiring arbitration if shareholders could not set value). Yet, we believe the record is not adequate to determine whether the price offered by BFI for the purchase of Jack's shares is so inadequate under the circumstances as to rise—when combined with the absence of a return on investment—to the level of actionable oppression.

Because the district court's ruling effectively terminated the trial before BFI presented its evidence bearing on the fair value of Jack's equity interest and because the district court failed to make the customary fact findings on the question normally filed as a consequence of a bench trial, we conclude the prudent course requires a reversal of the judgment of dismissal and a remand for further proceedings. This dispositional alternative is appropriate here not only because the truncated proceedings in the district court prevented the full development of the record necessary to establish the fair value of Jack's

stock on de novo review, but also because the court's conclusions of law were not separately stated as required by rule 1.904(1). We are not convinced the district court applied the reasonable expectations standard in the adjudication of Jack's claim of oppression. Had the proper standard been applied, the court could not have concluded the resolution of the oppression issue depended entirely on whether Jack demonstrated adequate efforts to obtain a return on his interest in the corporation and whether BFI's offers to purchase were below book value. Accordingly, we shall reverse the judgment dismissing Jack's claim and remand for further proceedings consistent with this opinion.

Although we have defined the legal standard for adjudicating Jack's claim of oppression, we express no view on the question of whether the last position taken by BFI during negotiations on the price offered for Jack's interest in the corporation was outside the range of fair value and incompatible with the reasonable expectations of a shareholder in Jack's position under circumstances including a history of no return on shareholder equity during the several decades of the corporation's existence.

### IV. Scope of Remand and Instructions.

The district court shall take whatever additional evidence is required for the proper development of the record from which the fair value of Jack's equity interest may be determined. If, after taking any additional evidence bearing on this question and applying the reasonable expectation standard set forth above, the district court finds BFI acted oppressively under the circumstances, the court, sitting in equity, has considerable flexibility in resolving the dispute. *See* Iowa Code § 490.1430 (providing court may dissolve corporation); *id.* § 490.1432 (providing court may appoint receiver to wind up and liquidate the

business, may appoint custodian to manage business and affairs, and may redesignate receiver a custodian and redesignate custodian a receiver); *id.* § 490.1434(1)–(3) (providing shareholders may elect, in lieu of dissolution, to purchase shares at fair value); *id.* § 490.1434(4)–(5) (providing court may stay proceedings and order purchase of shares at fair value upon application of any party); *Holden v. Constr. Mach. Co.,* 202 N.W.2d 348, 363–64 (Iowa 1972) (affirming order requiring payment of increased compensation plaintiff would have received had he not been denied promised employment); *Maschmeier,* 435 N.W.2d at 382 (affirming order requiring majority shareholders purchase minority shares at fair market value despite lower share value set by corporate bylaw); *Sauer v. Moffitt,* 363 N.W.2d 269, 275 (Iowa Ct. App. 1984) (affirming order requiring majority shareholders buy out minority shareholders at fair price and observing statute granting power to liquidate corporation allows district court to fashion other equitable relief); *Baker,* 507 P.2d at 395–96 (listing various remedies, including "entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event the stockholders fail to resolve their differences prior to the date"). In fashioning appropriate remedies, we have explained that trial courts should regard requests for general equitable relief with considerable liberality. *See Lange,* 520 N.W.2d at 117; *Schlotfelt v. Vinton Farmers' Supply Co.,* 109 N.W.2d 695, 700 (Iowa 1961); *Skemp v. Olansky,* 85 N.W.2d 580, 583 (Iowa 1957). We caution, however, that courts must be careful when determining relief to avoid giving the minority a foothold that is oppressive to the majority. *See Maschmeier,* 435 N.W.2d at 383. We also note that if, instead, the district court finds from the fully developed record evidencing the fair value of Jack's equity interest that no oppression has been demonstrated by a preponderance of the evidence, this action shall be dismissed.

### V. Conclusion.

For the reasons stated above, we conclude the district court erred in dismissing Jack's oppression claim. We reverse the district court's ruling and remand for further proceedings consistent with this opinion.

**REVERSED AND CASE REMANDED WITH DIRECTIONS.**

All justices concur except Appel and Mansfield, JJ., who take no part.