# IN THE SUPREME COURT OF IOWA

No. 19–1790

Submitted April 14, 2021—Filed May 14, 2021

**TRACY BARKALOW, TSB HOLDINGS, LLC,** and **BIG TEN PROPERTY MANAGEMENT, LLC,**

> Appellees/Cross-Appellants,

vs.

**BRYAN CLARK** and **JEFFREY CLARK,**

> Appellants/Cross-Appellees,

and

**JOSEPH CLARK,**

> Appellee/Cross-Appellee.

---

Appeal from the Iowa District Court for Johnson County, Paul D. Miller, Judge.

Two members of a limited liability company appeal an order judicially dissolving the LLC, while a third member cross-appeals the dismissal of his claims alleging oppression and breach of fiduciary duty. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which all participating justices joined. Oxley, J., took no part in the consideration or decision of the case.

Kevin J. Caster (argued) and Laurie L. Dawley of Shuttleworth & Ingersoll, P.L.C., Coralville, for appellants/cross-appellees.

William W. Graham and Wesley T. Graham (argued) of Duncan Green, P.C., Des Moines, for appellees/cross-appellants.

John E. Beasley (argued) and William N. Toomey of Phelan Tucker Law LLP, Iowa City, for appellee/cross-appellee.

**MANSFIELD, Justice.**

Hawkeye fans attending football games at Kinnick Stadium may sometimes wonder, "Who owns those houses along Melrose Avenue near the stadium? They must be pretty valuable." Some of them, it turns out, belong to the limited liability company involved in this case. Unfortunately, the members in this LLC seem to have spent more time squabbling than enjoying the fruits of their wise investment. Claims and counterclaims led to a trial in the Johnson County District Court. After the trial, the district court entered an order resolving all claims and decreeing dissolution of the LLC.

The case now comes to us on appeal. For the most part, we conclude that the district court properly adjudicated the parties' rights. However, we determine that the court erred in ordering dissolution of the LLC. The court failed to give itself credit for having resolved the major controversies in the LLC. The LLC can continue to operate profitably, without deadlock, and in accordance with its certificate of organization and its operating agreement. Dissolution is not needed because it is "reasonably practicable to carry on the company's activities in conformity with the certificate of organization and the operating agreement." Iowa Code § 489.701(*d*)(2) (2017). For these reasons, we affirm the judgment of the district court, except to the extent it ordered judicial dissolution and, as part of dissolution, reclassification of member capital contributions as debt. On this point, we reverse the district court.

## I. Facts and Procedural History.

This case concerns an LLC named Outside Properties. Founded in 2009 by three brothers and a brother-in-law, the LLC came to own seven rental properties, several of them quite near to the University of Iowa football stadium.

**A. Formation of the LLC (2009).** Tracy Barkalow has been involved in real estate since leaving school. He is the sole owner of two companies: Big Ten Property Management, a property management company, and TSB Holdings, which owns apartment buildings.

In August 2009, Barkalow had the opportunity to purchase a rental property on Melrose Avenue in Iowa City, but he lacked the required cash. He asked Bryan Clark to lend it to him. Bryan was married to the sister of Barkalow's wife, so Barkalow knew him socially and they had a good relationship. Barkalow also knew Bryan's brother Jeff, who was married to another sister of Barkalow's and Bryan's spouses. Bryan and Jeff had supported Barkalow's borrowing in the past by cosigning loans for him.[1]

After holding discussions, Barkalow, Bryan, Jeff, and a third Clark brother (Joe) decided to form an LLC to acquire the Melrose Avenue property. The LLC became known as Outside Properties. The plan was for each of the four to put in $37,500 to cover the $150,000 down payment on the property. Because an initial $14,000 installment payment was also required, the total capital contribution from each member came to $41,000. Barkalow didn't have the funds for his share, so the Clarks loaned it to him on a verbal agreement.

According to the certificate of organization, the purpose of Outside Properties was primarily "to invest in real estate holdings." Under the heading "Additional Liability of Members," the certificate of organization stated, "[N]o additional capital contributions will be required." The certificate also stated that the members (or managers elected by them) would conduct the business of the company and that "[t]he return of

---

[1]Because this case involves three Clark brothers, we shall refer to them individually by their first names.

capital and the distribution of profits shall be determined from the company's books."

Each of the four members also received a management certificate which vested the member with a 25% ownership interest but also said,

> The stated capital contribution and proportionate equity interest is subject to change and is reflected in the books and records of the company that are prepared and kept in accordance with the Certificate of Organization and all Operating Agreements as may be in force from time to time.

The operating agreement generally provided for each member to have a single vote on management issues. However, it contained a "demand" rule, under which any member could demand that "voting on a particular issue shall be in proportion to the capital contributions of each member to the company, as adjusted from time to time to reflect any additional contributions or withdraw[al]s." The quorum was also based on "a majority of the equity interests, as determined by the capital contribution of each member as reflected on the books of the company." The operating agreement required unanimous agreement for the distribution of profits.

**B. Expansion of the LLC (2010–11).** Over time, Outside Properties acquired six other rental properties in Iowa City. Most of the properties were located near Kinnick Stadium. To cover the down payments, the Clarks loaned money to Outside Properties. Either the seller, a bank, or the Clarks financed the remaining balance. Thus, in 2010, Outside Properties acquired three properties from Ellis Shultz in 2010 for a total of $1.2 million, with $1,080,000 financed by Shultz. The loan provided for a balloon payment due to seller on December 1, 2015.

The four members performed different roles in the LLC. Barkalow provided the day-to-day management of the seven rental properties, which

together encompassed eleven rental units. Bryan performed maintenance. Jeff did some remodeling. Joe was more of an investor. The Clarks were responsible for arranging financing because Barkalow's financial resources were limited during much of this time. As Barkalow put it, "It was kind of a team effort up to a point on how to get things done."

Barkalow, Bryan, and Jeff and their respective sister–spouses also socialized together during the 2009 through 2013 time period. They took vacations together. Joe was less involved in this social circle.

In 2010, the members agreed to amend the operating agreement for estate tax planning purposes. Under this amendment, two classes of interests were created. The interests of Barkalow, Bryan, Jeff, and Joe were recognized as Class A voting interests. However, each was given the ability to transfer units to family members who would then become nonvoting Class B members.

After this amendment took effect, Bryan, Jeff, and Joe transferred Class A units to their respective children. This reduced each of the Clark brothers' interests in Outside Properties to 11%, while providing each set of children with a 14% (nonvoting) interest.

**C. Disagreements Among Members (2013–15).** In 2013, the relationship between Barkalow, on the one hand, and Bryan and Jeff, on the other, began to deteriorate. Barkalow claimed he had always had an oral agreement to buy the entire company at a fee to be set by the Clarks, which the brothers denied. Bryan and Jeff were tired of having their funds tied up in various loans to Barkalow that he used to sustain his other property investments. Also, Barkalow began to question the validity of the Clark loans to Outside Properties, taking the position, "no note, no mortgage, no payment." In 2014, Outside Properties stopped making

payments on the Clark loans.[2] Barkalow also unilaterally halted efforts by the LLC to obtain bank financing to replace the Clark loans. Furthermore, without approval of the other members, Barkalow arranged for some electronic payments totaling $8,000 to be made to Big Ten for management fees. Additionally, Barkalow had never paid for his initial capital contribution in Outside Properties, and did not do so until September 2016.

Joe avoided these disputes and tried to be a peacemaker between his brothers and Barkalow. Yet, the dissension only mounted. Another bone of contention was Barkalow's assertion that each of the Clark brothers had reduced his ultimate voting power to 11% by transferring interests to his respective children.[3]

**D. The Disputed Capital Contributions (December 2015–July 2016)**. The Shultz balloon payment was due on December 1, 2015, and Barkalow refused to cooperate in arranging outside financing to pay off Shultz. Shultz was only willing to agree to a minimal extension of the due date to December 9. Bryan, Jeff, and Joe did not want to go into default. All four members met on December 7 and were unable to resolve their differences.

Accordingly, Bryan, Jeff, and Joe agreed to make capital contributions of $333,956.62 each to the LLC in order to cover the balloon payment and avoid default. Their action was communicated by email on December 9 and ratified at a December 17 member meeting attended by

---

[2]By then, loans from the Clarks had replaced all of the LLC's financing except for the Shultz loan.

[3]Barkalow pursued this argument at trial and the district court ruled against him. The district court found that under the "demand" vote provision in the operating agreement, voting is in proportion to "capital contributions," not units or interests. Barkalow has not appealed this issue.

all four members. Barkalow was given the opportunity to participate in the capital contribution and declined to do so.

At the same time as Barkalow declined to contribute capital to Outside Properties, he was expanding his TSB real estate portfolio. As Barkalow later testified, "So you're asking me to deprive myself of gaining another company to benefit [Outside Properties], correct, I did not do that at the time, correct."

On February 19, 2016, another member meeting was held. The Clarks made an offer to Barkalow to buy out his interest in Outside Properties for the undiscounted fair market value assuming a full 25% share. Barkalow declined that offer. The discussion then turned specifically to the Clark loans, which totaled approximately $950,000. A proposal was made to obtain third-party financing of approximately $2 million to cover both the Clark loans and the December 2015 Clark capital contributions, thereby restoring all parties to 25% each. Barkalow declined that proposal as well. Barkalow made it clear he intended to sue Bryan and Jeff and was not interested in signing a global release.

Next, the proposal was made to seek voluntary capital contributions to pay off the Clark loans. This proposal passed three-to-one over Barkalow's "no" vote. Barkalow was given the opportunity to participate in the capital contributions, but he made it clear he did not intend to do so.

Bryan and Jeff each made capital contributions in June 2016 to cover their respective one-third of the Clark loans. Joe, however, objected to Bryan's and Jeff's use of a certain Clark-affiliated entity as the source of funds. Therefore, despite his earlier "yes" vote in February, he declined to participate in funding the payoff of the Clark loans. Bryan and Jeff together made up his share.

**E. Further Disagreements (September 2016–June 2017).** In September 2016, Barkalow arranged for Outside Properties to pay $117,617.70 in retroactive management fees to Big Ten, his solely-owned management company. Barkalow also withdrew $27,585.75 for costs of a class action settlement. Outside Properties, however, had not been a party to that class action case. Barkalow maintained that the Clark brothers were indirectly responsible for the settlement payment he had to make in the class action because, allegedly, they had insisted he use a legally invalid lease form as a condition of lending money to him.

Relations among the members within the LLC continued to be acrimonious. Barkalow objected to the dilution of his interest by the Clark brothers' capital contributions. Bryan and Jeff objected to Barkalow's unapproved payments to himself. Joe objected to having his interest diluted by the second set of capital contributions. Joe tried to mediate, favoring a plan that would restore everyone's capital account to 25%.

**F. The Litigation in District Court (June 2017–August 2019).** On June 6, 2017, Barkalow, TSB, and Big Ten filed suit in the Johnson County District Court against Bryan, Jeff, and Joe. As subsequently amended, his petition sought an order expelling them as members, an order dissolving Outside Properties, an order appointing a receiver for the LLC, and damages for breach of contract, breach of fiduciary duty, "economic duress," and civil conspiracy. Bryan, Jeff, and Joe answered. Bryan and Jeff also filed a number of counterclaims. To fend off a receivership hearing, the parties ended up reaching an interim agreement that Big Ten would provide ongoing management for $900 per month.

A five-day nonjury trial took place from December 11 to 17, 2018. In addition to the four principals, Jason Wagner, the accountant for Outside Properties, testified. He attended only one member meeting, in

April 2015, and recalled "a lot of disagreement." In general, he felt there was considerable animosity between Barkalow and both Bryan and Jeff. Wagner testified these disputes made it very difficult for him to do his job:

> Q. . . . And there was disputes over keeping those books; correct? A. Correct.

> Q. And there was disputes over who was to provide you necessary information so you could do the -- your firm could do the accounting for Outside Properties; correct? A. Correct.

> Q. There was disputes over who the tax partners should be; correct? A. Correct.

> Q. There were disputes over parties' ownership interests; correct? A. Correct.

> Q. And when you have disputes over parties' ownership interests, does it make it almost impossible to complete tax returns for the year? A. Very difficult, yes.

> . . . .

> Q. There's obviously disputes -- correct? -- on how to treat cash infusions; correct? A. Correct.

> Q. There's been disputes on who should sign the checks for the company; correct? A. Correct.

> Q. And, in fact, there's been disputes on who should have possession of the company checkbook; correct? A. Correct.

> Q. There's been disputes on who should sign tax returns; correct? A. Correct.

> Q. And with those disputes ongoing within the company -- right? -- the fact is it makes your job as the company accountant extremely difficult or nearly impossible to do properly, doesn't it? A. Correct.

However, Wagner did confirm that he recorded Bryan's, Jeff's, and Joe's capital contributions as such on the LLC books.

Joe's trial testimony, like his actions prior to the lawsuit, tended to forge a middle path between Barkalow, on the one hand, and Bryan and

Jeff, on the other. Joe testified that he favored dissolution of the LLC and wanted all four of the original members restored to a 25% capital position.

Barkalow also supported dissolution. Barkalow vigorously opposed any recognition of the 2015 and 2016 capital contributions, which had diluted his capital position to below 1% (.595%). Joe, for his part, strongly took issue with his brothers' 2016 capital contributions having the effect of diluting his capital position to approximately 20%.

There was no dispute, however, that Outside Properties was profitable and continuing to make money. Its real estate holdings were increasing in value. The LLC was estimated to be worth approximately $4 million at the time of trial. Even if the Clark capital contributions were reclassified as debt, there would still be $2 million in returns of capital to be distributed to the members in the event of a dissolution. The trial testimony indicated that the members had contemplated a long-term investment and that dissolution would lead to immediate adverse tax consequences.

On August 8, 2019, the district court entered its findings of fact and conclusions of law. In a detailed thirty-eight page ruling, the court generally rejected Barkalow's trial contentions and adopted those of Bryan and Jeff. Thus, it found that both sets of capital contributions were supported by a legitimate business purpose: the Shultz loan was in default and no payments had been made on the Clark loans for nearly two years. Barkalow, it noted, had been offered the opportunity to participate in both sets of contributions and had declined. The court found there had been no violation of the terms of the certificate of organization. Additional capital contributions could not be "required," but the LLC documents clearly contemplated the possibility of further capital contributions. The 2015 and 2016 capital contributions had occurred voluntarily, with due

approval by votes of the members and with all members invited to participate.

The court denied Barkalow's claims for dissolution based on majority oppression, noting that he had been offered a buyout of his interest on the basis of 25% ownership and undiscounted fair market value. *See Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 676–77 (Iowa 2013) (indicating a claim of oppression can arise when a minority shareholder in a close corporation is not able to obtain a return on investment or to sell their shares for an amount reasonably related to fair value). The court added, "It is fair to say that the evidence clearly shows that Tracy was a difficult partner." The court also denied Barkalow's claims for breach of fiduciary duty, civil conspiracy, and breach of contract, specifically finding that the buyout option he claimed to have was "too indefinite to form a binding contract." The court further rejected Barkalow's claims that Bryan and Jeff had required him to use a particular lease form in his separate apartment rental operations.

Additionally, the court found there had been an agreement from the beginning that each member would provide services to Outside Properties free of charge. Pursuant to that understanding, Bryan and Jeff had performed construction and remodeling work without reimbursement. There had been no agreement that Barkalow would be paid for property management services. With this finding in mind, the court determined that Barkalow had wrongfully converted assets of the LLC when he transferred a total of $125,617.70 to Big Ten for unapproved management fees and $27,585.75 for an unrelated class action settlement. The court ordered Barkalow and Big Ten to repay $153,203.45 plus interest at the rate of 3.5% from September 15, 2016.

Yet, in the final section of its ruling, the district court granted Barkalow's request to dissolve the LCC based on the impracticability of continuing its business. *See* Iowa Code § 489.701(1)(*d*)(2). The court concluded that it was

> not reasonably practicable to carry on the Company's activities in conformity with the certificate of organization and operating agreement in light of the intensity, longevity and number of disputes and issues existing between Tracy, Bryan and Jeff which are fueled by their long time acrimonious, bitter, and toxic relationship.

On this point, the court took particular note of the testimony of Wagner, Outside Properties' accountant. In the course of ordering dissolution, the court also used its "equitable powers to fashion a remedy that [it] believe[d] [wa]s as fair as possible to all members." Thus, it directed that the 2015 capital contributions by Bryan, Jeff, and Joe, and the 2016 capital contributions by Bryan and Jeff, be recategorized as debt. This meant that all four members would be returned to a 25% equity position.[4]

**G. This Appeal.** Bryan and Jeff appealed, and Barkalow cross-appealed. In their appeal, Bryan and Jeff argued that the district court erred in ordering dissolution of Outside Properties, a viable and profitable enterprise, given that the court's ruling had resolved the members' disputes. They also urged that even if dissolution was proper, the court exceeded its statutory and equitable authority by transforming the brothers' capital contributions into debt. Barkalow's cross-appeal maintained that the district court should have ordered dissolution based on oppression and awarded damages for breach of fiduciary duty.

We retained the appeal.

---

[4]In this part of its ruling, the district court essentially adopted Joe's litigation position.

## II. Standard of Review.

Judicial dissolution is an equitable proceeding and our review is de novo. *See Baur*, 832 N.W.2d at 668. The parties have agreed that Barkalow's breach of fiduciary duty claim is also subject to de novo review, and we accept that stipulation for purposes of this appeal. However, we give weight to the district court's factual findings for institutional and pragmatic reasons. *See Struve v. Struve*, 930 N.W.2d 368, 371 (Iowa 2019).

## III. Legal Analysis.

**A. Barkalow's Oppression and Breach of Fiduciary Duty Claims.**
Although Barkalow is not the original appellant, we will address his cross-appeal first because it sets the stage for our ruling on Bryan and Jeff's appeal.

Iowa Code section 489.701(*e*)(2) authorizes dissolution of an LLC by the court, on application by a member, when "those members in control of the company . . . [h]ave acted or are acting in a manner that is oppressive and was, is, or will be directly harmful to the applicant." Barkalow argues that the Clark brothers engaged in oppressive conduct that directly harmed him when they diluted his ownership interest in Outside Properties in 2015 and 2016.

We have said that determining whether the conduct of controlling directors and majority shareholders in a close corporation is oppressive "must focus on whether the reasonable expectations of the minority shareholder have been frustrated under the circumstances." *Baur*, 832 N.W.2d at 674. In *Manere v. Collins*, the Appellate Court of Connecticut applied the reasonable expectations standard to a claim for dissolution of an LLC based on oppression. 241 A.3d 133, 154 (Conn. App. Ct. 2020). The court noted that Connecticut had adopted the Revised Uniform

Limited Liability Company Act (RULLCA), and "the commentary emphasizes that '[i]n many jurisdictions the concept [of oppression] equates to or at least includes the frustration of the plaintiff's reasonable expectations.' " *Id.* (alterations in original) (quoting Rev. Unif. Ltd. Liab. Co. Act § 701, cmt., (Unif. L. Comm'n 2006) (amended 2013), 6C U.L.A. 135) (2016)).  Iowa, likewise, has adopted the RULLCA.  *See* Iowa Code § 489.101.

As the *Manere* court observed, according to the RULLCA commentary, reasonable expectation factors include

> whether the expectation: (i) contradicts any term of the operating agreement or any reasonable implication of any term of that agreement; (ii) was central to the plaintiff's decision to become a member of the limited liability company or for a substantial time has been centrally important in the member's continuing membership; (iii) was known to other members, who expressly or impliedly acquiesced in it; (iv) is consistent with the reasonable expectations of all the members, including expectations pertaining to the plaintiff's conduct; and (v) is otherwise reasonable under the circumstances.

*Id.* at 156–57 (quoting Rev. Unif. Ltd. Liab. Co. Act § 701, cmt., 6C U.L.A. 135).

We agree with the district court's implicit determination that Barkalow's expectations were unreasonable, rather than reasonable.  He contributed no money to Outside Properties, not even the funds for his original capital position.  He expected the Clark brothers to finance everything.  He blocked efforts to obtain outside financing.  He chose to pledge his own assets as collateral for an expansion of his personal real estate holdings, not for the use or benefit of the LLC in which he was only a 25% participant.

We agree with the district court that Barkalow also misread the LLC's founding documents.  Those documents are a major determinant of

a member's reasonable expectations. The management certificate and the operating agreement made clear that a member's capital position was subject to change. The provision in the certificate of organization that no additional capital contributions "will be required" bore the heading "Additional Liability of Members." Thus, it meant that members could not be assessed for additional contributions they did not want to make, but there was no guarantee that a member's relative ownership position would remain constant if he elected not to make an additional contribution when others did.

The certificate of organization contemplated the acquisition of other properties. The stated purpose was "to invest in real estate *holdings*." (Emphasis added.) So Barkalow should not have been surprised that the original capital contributions needed to be supplemented. And, as the district court noted, Barkalow refused to accept a buyout of his interest for its undiscounted fair market value. That was the very thing the minority stockholder had been *unable* to obtain in *Baur*, and which undergirded the oppression claim in that case. *See* 832 N.W.2d at 666–67, 676.

Barkalow devoted considerable trial time attempting to prove that Bryan and Jeff harbored a secret intent since 2013 to dilute his interest. But he never offered a practical alternative to capital contributions for settling the LLC's outstanding debts to Shultz and the Clarks in late 2015 and early 2016.[5] At most, therefore, Barkalow proved "[w]icked meaning

---

[5]We note that Joe, like Barkalow, argued that each of the four members should retain a 25% capital position. Yet, at the same time, Joe acknowledged that he voted for capital contributions to pay off both loans and that Shultz needed to be repaid at the beginning of December 2015 to protect the LLC from losing those properties. Further, Joe's primary objection to Bryan's and Jeff's June 2016 contributions to pay off the Clark loans had to do with their source of funding, which was an internal Clark matter, not an Outside Properties issue. Joe thus did not offer a practical alternative to capital contributions, either.

in a lawful deed." William Shakespeare, *All's Well That Ends Well*, act 3, sc. 7.

Barkalow wanted the Clarks to maintain their outstanding funding of Outside Properties without repayment. His byword was "no note, no mortgage, no payment." In short, Barkalow wanted something from the Clarks that would *function like* a capital contribution without actually *being* a capital contribution. That was not realistic. The district court properly rejected Barkalow's oppression claim and his related fiduciary duty claim asserting the same misconduct. We therefore affirm as to Barkalow's cross-appeal.

**B. Barkalow's Claim for Dissolution Based on Impracticability**. We turn now to what we regard as the more difficult issues in the case— those relating to Bryan and Jeff's appeal. Iowa Code section 489.701(*d*)(2) authorizes dissolution when "[i]t is not reasonably practicable to carry on the company's activities in conformity with the certificate of organization and the operating agreement."

Bryan and Jeff argue that the district court confused past with present. Implicitly, Bryan and Jeff concede that during 2015 and 2016, Outside Properties was a troubled company. But they argue that the district court's resolution of the capital contribution controversy and the parties' other claims has set a stable path for the future. Accordingly, they believe the district court erred in finding that it was no longer reasonably practicable to carry on Outside Properties' activities in accordance with the certificate of organization and operating agreement. In fact, Bryan and Jeff note that the LLC has continued to operate and take in rental income during the course of this litigation. Even Barkalow acknowledges it has been a financial success.

We have not yet had occasion to interpret Iowa Code section 489.701(*d*)(2). But other jurisdictions have analyzed the question of whether it is "not reasonably practicable to carry on" an LLC's activities. Typically, dissolution is ordered when there is actual, unbreakable deadlock. *See, e.g., Gagne v. Gagne,* 459 P.3d 686, 695 (Colo. App. 2019) (affirming judicial dissolution based on "a real and material deadlock"); *Saunders v. Firtel,* 978 A.2d 487, 536–37 (Conn. 2009) (affirming dissolution where each member owned 50% and they "have ceased to have any business or personal relationship"); *Haley v. Talcott,* 864 A.2d 86, 94–95, 98 (Del. Ch. 2004) (ordering dissolution where each member owned 50% of the LLC, "neither party assert[ed] that any reconfiguration ha[d] occurred," and "the evidence clearly support[ed] a finding of deadlock between the parties about the business strategy and future of the LLC"); *Simmons Fam. Properties, LLLP v. Shelton,* 705 S.E.2d 258, 261 (Ga. Ct. App. 2010) ("[T]he members of DDE were effectively deadlocked over several issues and . . . the situation appeared unlikely to change."); *In re Cat Island Club, L.L.C.,* 94 So.3d 75, 79–80 (La. Ct. App. 2012) (upholding judicial dissolution where there were four remaining members of the LLC divided two-to-two and the situation was at an impasse); *Kirksey v. Grohmann,* 754 N.W.2d 825, 831 (S.D. 2008) (ordering judicial dissolution where the LLC was deadlocked between each half of ownership and the deadlock " certainly impede[d] the continued function of the business in conformity with its operating agreement"); 1 Hodge O'Neal & Robert B. Thompson, *O'Neal and Thompson's Close Corporations and LLCs: Law and Practice* § 5:22, Westlaw (rev. 3d ed. Nov. 2020 Update) ("The most recurring pattern where courts have found [the not reasonably practicable] standard met has been where the parties are split, often 50/50, and there is evidence of a breakdown in the relationship between the parties.").

In the absence of deadlock, courts have been reluctant to order dissolution so long as it is possible to continue to operate the company in accordance with its certificate of organization and management agreement. In other words, there has to be either a deadlock or a clear inability to fulfill the contracted purposes of the LLC, usually but not invariably for financial reasons. *See, e.g., Venture Sales, LLC v. Perkins*, 86 So.3d 910, 917 (Miss. 2012) (affirming judicial dissolution where the LLC "has existed for more than ten years and has yet to achieve, or even begin fulfilling, its stated purpose"); *Mizrahi v. Cohen*, 961 N.Y.S.2d 538, 541 (App. Div. 2013) ("Under the circumstances presented, it is not reasonably practicable for the LLC to continue to operate, as continuing the LLC is financially unfeasible.").

Thus, in several notable cases, courts have refused to order dissolution based on member disputes. In *Dysart v. Dragpipe Saloon, LLC*, the South Dakota Supreme Court decided a case involving an LLC with four 25% owners that owned a bar and real estate. 933 N.W.2d 483, 484–85 (S.D. 2019). Two of the members wanted to sell their interests but a couple of proposed transactions faltered. *Id.* at 485. The two members then filed for judicial dissolution. *Id.* The trial court ordered dissolution on the grounds that the bar was unable to return the members' original capital contributions and that the parties were "at a standstill" on whether to sell the property. *Id.* at 485–86.

The South Dakota Supreme Court reversed. *Id.* at 484. It observed, "An involuntary judicial dissolution represents an exceptional level of intervention into the otherwise private agreement of an LLC's members." *Id.* at 486–87. It concluded,

> The fact that the Appellees believe it to be a prudent time to sell Dragpipe's real property and realize the gain from their investments does not mean Dragpipe is unable to

continue to operate in accordance with its stated purposes. Nor do the historic losses or Dragpipe's failure to return income distributions to its members render its operation impracticable. In more recent years, Dragpipe's performance has improved and yielded profitable results, if not large cash returns, for its members. . . .

. . . In the absence of an order directing judicial dissolution, Dragpipe will continue to operate more or less as it has since its inception. Even if, as the circuit court found, the principal means of making money for Dragpipe's members will ultimately be through the sale of the real property, that does not mean that the members' failure to reach a consensus about a proposed sale here is likely to frustrate Dragpipe's economic purpose.

*Id.* at 487–88. The court went on to note that under the terms of the operating agreement, the two members could resign and receive the fair market value of their interests. *Id.* at 488. In closing, the court noted that "[t]he members are not effectively deadlocked and have multiple options for resolving their disagreement about the sale of Dragpipe's real estate." *Id.* Accordingly, it rejected the "drastic remedy" of judicial dissolution. *Id.*

The lesson of *Dragpipe* is that LLC's are ultimately member contracts, and courts should not be rewriting contracts unless it is truly necessary to do so. While the operating agreement here (unlike in *Dragpipe*) does not have a "put" that allows a member to sell out their interest for fair market value, there is no indication in this record that such a buyout would not be available. And in some ways, the present case is a weaker one for judicial dissolution because the present allocation of interests means there will be no tie votes.

In *Dunbar Group, LLC v. Tignor*, the Virginia Supreme Court reversed an order of judicial dissolution of a software company. 593 S.E.2d 216, 219–20 (Va. 2004). Disputes had arisen between the two 50–50 members. *Id.* at 217. One member committed a serious of wrongful acts, including commingling LLC funds with his own funds; restricting the other member's

access to the LLC's premises, equipment, and the email system; and preventing the other member from writing checks on the LLC's account. *Id.* at 218. The trial court removed the misbehaving member as an active member but then also ordered the LLC dissolved. *Id.* On appeal, the Virginia Supreme Court overturned the second half of this judgment, reasoning,

> The record here, however, does not show that the chancellor evaluated the evidence in light of the fact that Tignor was being expelled as a member and manager of Xpert. Although Tignor's actions in those capacities had created numerous problems in the operation of Xpert, his expulsion as a member changed his role from one of an active participant in the management of Xpert to the more passive role of an investor in the company. The record fails to show that after this change in the daily management of Xpert, it would not be reasonably practicable for Xpert to carry on its business pursuant to its operating authority.

*Id.* at 219–20. Likewise, here, we believe the district court erred in failing to consider the judicial dissolution claim in light of the other matters previously resolved by its ruling—namely, the capital contribution controversy and Barkalow's claims that Bryan and Jeff had breached their fiduciary duties to him.

The New York Appellate Division refused to uphold the judicial dissolution of an LLC in *In re 1545 Ocean Avenue, LLC*, 893 N.Y.S.2d 590, 592 (App. Div. 2010). Although the two 50–50 members were at loggerheads, the intended real estate project was "within weeks of completion" and the operating agreement allowed unilateral action by one of the two member–managers. *Id.* at 593. The court opined,

> After careful examination of the various factors considered in applying the "not reasonably practicable" standard, we hold that for dissolution of a limited liability company pursuant to LLCL 702, the petitioning member must establish, in the context of the terms of the operating agreement or articles of incorporation, that (1) the management of the entity is unable or unwilling to reasonably

permit or promote the stated purpose of the entity to be realized or achieved, or (2) continuing the entity is financially unfeasible.

*Id.* at 597–98.

Neither of the conditions for dissolution identified by the New York court is present here. Outside Properties is fulfilling its intended purpose of investing in real estate properties, and it is doing so profitably.

In *In re Arrow Investment Advisors, LLC*, the influential Delaware Chancery Court commented, "Given its extreme nature, judicial dissolution is a limited remedy that this court grants sparingly." C.A. No. 4091–VCS, 2009 WL 1101682, at *2 (Del. Ch. April 23, 2009). The court added,

> [D]issolution is reserved for situations in which the LLC's management has become so dysfunctional or its business purpose so thwarted that it is no longer practicable to operate the business, such as in the case of a voting deadlock or where the defined purpose of the entity has become impossible to fulfill.

*Id.* Here, there is no voting deadlock and the defined purpose of the entity has not become impossible to fulfill—indeed, it is being fulfilled under an interim management agreement during the course of this litigation. *See also In re Seneca Invests. LLC*, 970 A.2d 259, 263–64 (Del. Ch. 2008) (dismissing petition for judicial dissolution where no voting deadlock was alleged even though the LLC was functioning only as a passive investment vehicle).[6]

---

[6]A thoughtful note in the Drake Law Review argues for a restrained approach to the related issue of member dissociation by judicial order under Iowa Code section 489.602(5)(*c*), which employs the same "not reasonably practicable" standard:

> Ultimately, a restrained interpretation of the "not reasonably practicable" language in Iowa Code section 489.602(5)(*c*) by Iowa courts advances "legislative deference to the parties' contractual agreement to form and operate a limited liability company." The Iowa General Assembly chose to adopt an LLC statute modeled on a uniform act, which itself emphasizes the overarching contractual nature of limited liability companies. Thus, adherence to a "robust application of freedom of

In sum, we are not persuaded that judicial dissolution should have been ordered. Dissolution under Iowa Code section 489.701(*d*)(2) is not a wide-ranging mechanism for doing equity, but a drastic remedy to be ordered when an LLC is truly in an unmovable logjam or cannot as a practical matter carry on its contracted purpose. Neither circumstance is present here. Because we reverse the district court's decision to order dissolution of Outside Properties, we also reverse its order recategorizing the Clark capital contributions as debt that was part of the dissolution decree.

**IV. Conclusion.**

For the foregoing reasons, we affirm the judgment of the district court except for its ruling on count II of Barkalow's amended petition. There, we reverse the district court's order directing dissolution of Outside Properties and its recategorization of the Clark capital contributions. We remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Oxley, J., who takes no part.

---

contract," both the severe and discretionary nature of judicial expulsion, and the risk that feuding LLC members will race to the courthouse rather than attempt to reconcile differences, all counsel in favor of a general wariness towards judicial dissociation under the "not reasonably practicable" standard of Iowa Code section 489.602(5)(c).

Patrick Shanahan, "Goodbye and Good Luck: Member Dissociation by Judicial Order Under Iowa's Revised Uniform Liability Company Act," 61 Drake L. Rev. 535, 587 (2013) (footnotes omitted). We think those comments are also apt in the context of judicial dissolution.